Ex Parte J. F. WOLTERS.

No. 1439.   Decided December 6, 1911.

Rehearing denied February 28, 1912.

**1.—Contempt—Witness—Special Session—Legislature—Constitutional Law.**

When the Legislature is convened in special session, under article 3, section 40 of the Constitution, express limitation is placed upon the power of that body to legislate upon any subjects or subject except those specially designated in the Governor's proclamation convening it, or such as may be subsequently presented by the Governor; nor can it investigate matters for legislative purposes not submitted by the Governor and compel witnesses to answer questions and punish them for contempt either by concurrent resolution or a resolution of either House. Harper, Judge, and Prendergast, Judge, dissenting.

**2.—Same—Regular Session—Legislative Power—Difference.**

There is a marked difference between the powers of a regular and a special session of the Legislature under the Constitution; during a regular session its authority to enact laws and make investigations is as broad as is the constitutional guaranty of power to legislate, and the limitation of such power is to be found either expressed or implied in the Constitution; but the rule is entirely different when the Legislature meets in special session, then it is without power or constitutional authority to appoint committees to investigate matters upon which it can not legislate and empower them to compel witnesses to answer questions thereon and punish for contempt for obstructing its proceedings. Harper, Judge, and Prendergast, Judge, dissenting.

**3.—Same—The Legislature is the Creature of the Constitution.**

The Legislature derives its power from the Constitution and is dependent solely on the Constitution for its existence and authority. Both Houses of

such body are but creatures of the Constitution, and outside of the provisions of that instrument, can have no authorized existence, and in no instance, could either House or the Legislature act as a judicial body unless power is expressly conferred upon them by the Constitution for that purpose; and only in matters within their jurisdiction, can they punish for contempt for disrespectful or disorderly conduct for obstructing legislative proceedings. By Davidson, Presiding Judge.

### 4.—Same—Inherent Power to Punish for Contempt.

Had the Constitution remained silent upon the question of the power of the Legislature to punish for contempt, we might be called upon to enter the domain of its inherent power to do so, but by article 3, section 15 of the Constitution, the power to punish for contempt to protect itself against disrespectful and disorderly conduct is fixed and limited, and it is, therefore, unnecessary to discuss the question of inherent power in the Legislature to punish for contempt. By Davidson, Presiding Judge; Prendergast, Judge, dissenting.

### 5.—Same—Jurisdiction—Subject Matter—Person—Judgment.

Before punishment for contempt can be inflicted, the body seeking to impose the punishment must have jurisdiction of the subject matter, of the person, and authority to render the particular judgment which is rendered; and the judgment is not conclusive upon the question of authority of the body imposing the contempt, but the courts can go behind the judgment and inquire into the facts where these do not justify or permit the particular judgment rendered. Following ex parte Degener, 30 Texas Crim. App., 566; Parker v. State, 35 Texas Crim. Rep., 12, and other cases. Prendergast, Judge, dissenting.

### 6.—Same—Jurisdiction—Witness—Pertinancy of Questions.

Conceding the jurisdiction of the Legislature over the person of relator, there would be wanting the authority of the Legislature to punish for contempt for his refusal to answer questions upon matters not submitted for legislation by the Governor at a special session, as the investigation must be germane and confine itself to subjects submitted by the Governor. Harper, Judge, and Prendergast, Judge, dissenting.

### 7.—Same—Appropriation Bill—Enforcement of the Law—Election.

Where the Governor, during a special session of the Legislature, asked an additional appropriation by special message for the enforcement of the laws, this did not authorize an investigation by the Legislature of the general election laws or of a prior election on State-wide prohibition just before the convening of such special session, and neither of which were submitted by the Governor to said session. Harper, Judge, and Prendergast, Judge, dissenting.

### 8.—Same—Governor's Proclamation—Special Session—Contempt of Witness—Case Stated.

Where relator was adjudged guilty of contempt by the House of Representatives during a special session of the Legislature, for refusing to answer questions before a special committee appointed by said House to investigate election frauds and the manner of holding an election recently held for State-wide prohibition, etc., and it appeared that the Governor had not called such special session to enact election laws or investigate such election and had not submitted these matters in any of his subsequent messages, said House was without power or authority to appoint such committee and to punish relator for contempt for his refusal to answer questions before said committee concerning said prohibition election or election laws, and he must be discharged. By Davidson, Presiding Judge; Harper, Judge, concurring in the result, but not in opinion. Prendergast, Judge, dissenting.

### 9.—Same—Motion for Rehearing—Original Habeas Corpus—Practice on Appeal.

Proceeding in habeas corpus to enlarge relator who is unlawfully r-

strained of his liberty is considered as a criminal proceeding and is a criminal case, and the State not having the right of appeal or of new trial, and a final judgment having been entered to discharge relator from custody in an original habeas corpus proceeding before the Court of Criminal Appeals, said court is without authority to recall such judgment and grant a rehearing in a case of criminal contempt. Harper, Judge, and Prendergast, Judge, dissenting, but Harper, Judge, concurring in overruling motion for rehearing.

From Travis County.

Original habeas corpus asking release from commitment for contempt under a judgment of the House of Representatives, adjudging relator guilty of contempt for refusing to answer questions before a legislative committee during a special session, inflicting a penalty of twenty-four hours confinement in the county jail.

The opinion states the case.

*Jonathan Lane, R. H. Ward, W. A. Hanger, J. L. Storey, H. M. Garwood, Nelson Phillips, R. S. Neblett* and *J. B. Stubbs,* for relator. —The Legislature of the State of Texas has none but legislative power, except in a few instances where other powers are conferred by express terms of the Constitution. Any effort to exercise any other than legislative power, either as an entire body, or by conferring such power upon either branch thereof, or by conferring such power upon committees of either branch thereof, is in violation of the Constitution.

The House of Representatives has no power to punish for contempt, except in such manner and for such acts as are expressly conferred by the Constitution itself.

The House of Representatives can not by simple resolution confer any power upon members of any of its committees not possessed by the entire House.

The Legislature, even by passing a bill in the manner required by the Constitution, can not confer upon itself, nor upon the separate branches thereof, nor upon its committees, any power, executive or judicial, unless so expressly authorized by the Constitution itself, nor can it delegate legislative powers to a committee.

The resolution under which the committee acted is unconstitutional and void, for the following reasons:

(a) It undertakes to confer powers upon the committee which the entire Legislature does not possess.

(b) It undertakes to grant power to the committee by virtue of the Act of 1907, passed by the Thirtieth Legislature, to do things which the Legislature itself had no authority to do under the Constitution, and which it could not authorize the separate branches thereof to do, nor could the Legislature delegate such power, even if it possessed it, to the separate branches, and authorize the separate branches to delegate them to committees.

(c) The powers so attempted to be conferred are legislative, judicial and executive.

An investigation instituted for political purposes, and not connected with intended legislation, nor to aid in any other matter upon which the House could act, and not intended to gather information to be used in contemplated legislation, would not be a legislative proceeding, nor give to the House, or its committee, jurisdiction to compel the attendance or require the testimony of witnesses, nor authorize their punishment for refusing to attend or to testify.

The House of Representatives and the committee before which the relator was requested to testify was not acting under or by authority of section 15, of article 3, of the Constitution, but under and by authority of the simple resolution passed by the House of Representatives, and, therefore, the House of Representatives can not lawfully act under the provisions of said section of the Constitution in this matter.

These authorities cite and approve the rules announced in Kilbourn v. Thompson, 103 U. S., 389, Lawyer's Ed., upon subjects respectively as indicated by the following catchwords:

What is due process of law? United States v. Lee, 106 U. S., 96; In re Mason, 43 Fed. Rep., 510; Langenberg v. Decker, 131 Ind., 471, and 16 L. R. A., 108; People v. Keeler, 32 Hun, 567 (note); Cross v. Brown, 19 R. I., 220.

Contrasting English and American decisions: State v. McLelland, 18 Neb., 236; People v. Keeler, 32 Hun, 589 (note).

Right of courts to review legislative action: Interstate Commerce Commission v. Brinson, 155 U. S., 4; In re Chapman, 166 U. S., 661; Tindal v. Wesley, 167 U. S., 204; Chapman v. U. S., 5th App. Dist. Col., 122; 8th App. Dist. Col., 302; Smith v. Myers, 109 Ind., 1; In re Davis, 58 Kan., 368; Purnell v. Mann, 105 Ky., 87; Eckstein's Petition, 148 Pa., 509.

Lack of power of Legislature to punish for contempt: People v. Keeler, 32 Hun, 595; People v. Lindischer, 51 N. Y., 735; In re McDonald, 66 How. (Pac.) 487; Courtney v. Knox, 31 Neb., 652; McDonald v. Peeler, 99 N. Y., 63.

Separation of governmental departments by Constitution: Ex parte Ginnochio, 30 Texas Cr. App. (Texas), 584; In re Chapman, 166 U. S., 661; Interstate Commerce Commission v. Brimson, 154 U. S., 447; McCray v. U. S., 195 U. S., 27; W. U. T. Co. v. Myatt, 98 Fed. Rep., 335; U. S. v. Seymour, 10 App. D. C., 294; Hovey v. State, 119 Ind., 395; State v. Hyde, 121 Ind., 20; Robertson v. State, 109 Ind., 79; State v. Noble, 118 Ind., 350; In re Sims, 54 Kan., 4, and 25 L. R. A., 312; Pratt v. Breckenridge, 112 Ky., 1; In re Daviis, 168 N. Y., 89; In re Dalton, 44 Ohio St., 142; Zanesville v. Zanesville Tel. Co., 63 Ohio, 442; Higbee v. Higbee, 4 Utah, 19; State v. Rosenbaum et al., 119 N. W. Rep., 894.

*D. W. Odell, Cullen F. Thomas, Luther Nickels* and *C. M. Cureton,*

for respondent.—The Legislature of the State of Texas and either branch thereof, in addition to the judicial power conferred upon it by the express provision of the Constitution, has the power to punish for contempt which is inherent in all legislative bodies and of which it can not divest itself. In re Chapman, 166 U. S., 661; People ex rel. McDonal, 99 N. Y., 463; State v. Matthews, 37 N. H., 450; Rapalpe on Contempt, sec. 2, page 3; Cooley's Constitutional Limitations, 164 (7th ed., page 193); Ex parte Parker, 74 S. C., 466; In re Falvy, 7 Wis., 630; Burnham v. Morrisey, 74 Am. Dec., 676; Anderson v. Dunn, 6 Wheaton, 204; People v. Sharp, 1 Am. St. Rep., 851; Ex parte Lawrence and Levings, 116 Cal., 298; Ex parte McCarthy, 29 Cal., 395; Lowe v. Summers, 69 Mo. App., 647.

The Legislature and either branch thereof may exercise any power not inhibited by the Constitution, and there can be no implied limitation on the powers of the Legislature, but all inhibition must be expressly stated in the Constitution and shall be strictly construed. Day Land & Cattle Co. v. State, 68 Texas, 534; Holley v. State, 14 Texas Crim. App., 505; Ex parte Brown, 38 Texas Crim. Rep., 295; Ex parte Mabry, 5 Texas Crim. App., 93; Bank of Chenango v. Brown, 26 N. Y., 467; Re 34th St. R. R. Co., 102 N. Y., 343; People v. N. Y. Board of Police, 107 N. Y., 235; People v. Thompkins, 64 N. Y., 53.

Improper motives can not be attributed to the Legislature, nor either branch thereof, and acts done within the discretion of the Legislature are not reviewable by the court, and the Legislature is the sole judge of the facts upon which it acts, and having determined in this case that the failure and refusal of the relator to answer the questions propounded to him by the investigating committee was in contempt of the House and that the questions were pertinent and material to the inquiry before the committee and that the refusal to answer the questions was an obstruction of the lawful proceeding of the House, such finding on the part of the House is final and can not be reviewed by this court. Canfield v. Gresham, 82 Texas, 10; Day Land & Cattle Co. v. State, 68 Texas, 534; People v. Rice, 16 L. R. A., 836; Baird's case, 73 N. Y. (Hun), 340; People v. Draper, 15 N. Y., 532; People v. Durston, 7 L. R. A., 715; Rumsey v. People, 19 N. Y., 41; Waterloo Mfg. Co. v. Shanahan, 14 L. R. A., 481; People v. Albertson, 55 N. Y., 50; Re N. Y. Elec. R. R. Co., 70 N. Y., 327; Amy v. Watertown, 130 U. S., 301; De Camp v. Eveland, 19 Barb., 81; Stevenson v. Colgan, 14 L. R. A., 459.

Improper motives can not be attributed to the Legislature: Amy v. Watertown, 130 U. S., 301; People v. Orange Co. Suprs., 17 N. Y., 235; Com. v. McWilliams, 11 Pa., 61; Sharpless v. Philadelphia, 21 Pa., 147; M. B. of Excise v. Baine, 34 N. Y., 657; People v. Budd, 5 L. R. A., 559.

That the particular part of paragraph 7 of the House Resolution authorizing the appointment of the Investigating Committee which ·

reads that "in addition to all the powers necessary to carry out the full and complete terms of this resolution, said committee shall," etc., and of which counsel for relator so vigorously complains, and under the authorities cited below, should receive a sensible construction. In re Chapman, 166 U. S., 661; L. O. B. v. U. S., 144 U. S., 47.

The mere fact that the preamble of the resolution did not specify the full scope of the investigation, nor that one purpose of the resolution was to investigate the conduct of members of the Legislature, does not affect the question of the jurisdiction of the committee and of the Legislature. In re Chapman, 166 U. S., 661.

If at the time of the passage of the resolution providing for the investigating committee, the Legislature was without jurisdiction, yet if after the passage of such resolution and the appointment of a committee thereunder, the House did acquire jurisdiction, such as would have been in the first instance sufficient for the appointment of the committee, and after acquiring such jurisdiction the House continued the service of such committee, then such ratification on the part of the House of its former passage of the resolution and the appointment of the committee thereunder would be retroactive and the passage of the original resolution and the appointment of the committee thereunder would be within the jurisdiction of the House. Day Land & Cattle Co. v. State, 68 Texas, 534.

Upon question of the Governor submitting road laws and independent school district school laws, etc., which were enacted into law during the special session and which involved laws with reference to elections and gave the Legislature power to investigate: Long v. State, 58 Texas Crim. Rep., 209; Brown v. State, 32 Texas Crim. Rep., 119; Baldwin v. State, 21 Texas Crim. App., 591; Devereaux v. City of Brownsville, 29 Fed. Rep., 742.

On question as to meaning of legislative proceedings or procedure: Angevine v. Fleishmann, 67 N. Y. Sup., 182; Kring v. Mo., 107 U. S., 221; Long v. State, 58 Texas Crim. Rep., 209; Morewood v. Hollister, 6 N. Y., 309; Uhe v. Ry. Co., 3 S. D., 563; State v. Lewis and Clark County, 33 Mont., 138; 32 Cyc., p. 406; Erwin v. U. S., 37 Fed., 470; Peoples v. White (N. Y.), 14 How. Prac., 498; Sanford v. Sanford, 28 Conn., 6; St. Joseph Mfg. Co. v. Harrington, 5 N. W., 568; Peoples v. Raymond, 57 N. E. Rep., 1066; Ex parte McGee v. State, 54 Pac. Rep., 1091.

On question as to the meaning of obstruction in legislative proceedings: Anderson v. Maloy, 32 Minn., 76; U. S. v. Williams, 28 Fed. Cas., 631; Davis v. State, 76 Ga., 721; Words and Phrases, 1890.

DAVIDSON, PRESIDING JUDGE.—The applicant was adjudged guilty of contempt of the House of Representatives, at the recent called session of the Legislature, for refusing to answer questions propounded by a committee appointed by that body to inquire into sundry and divers things supposed to have occurred in connection with the prohi-

bition election held on July 22, 1911. If this election had resulted favorably to prohibition, the proposed amendment would have supplanted the present system of local option and placed in effect statewide prohibition. The result, however, was antagonistic to prohibition, and the amendment was lost by a majority of about six thousand votes.

On June 20, 1911, His Excellency, Governor Colquitt, issued a proclamation calling a special session of the Thirty-Second Legislature to convene on Monday, July 31, 1911, in which proclamation he indicated the purposes to be:

1. To make appropriations for the support of the State government and for the public service for the fiscal years beginning September 1, 1911, and September 1, 1912.

2. To apportion the State into senatorial districts and into representative districts and to fix the basis of representation therefor.

3. To consider and act upon such other matters as may be presented by the Governor, pursuant to section 40 of article 3 of the Constitution of Texas.

The Legislature met, and in pursuance to said call, began its work on July 31, 1911. About August the first, realizing the fact that authority had not been mentioned in the proclamation of the Governor for the purposes for which concurrent resolution No. 1 was introduced in the Senate, seventeen members of the Senate, who were all favorable to statewide prohibition, presented said resolution to the Governor. The first section of that resolution related to the amendment of the election laws so as to further provide against illegal payment of poll taxes, and to enact such other laws as were deemed by the committee necessary to safeguard the ballot box, and to secure elections without taint of irregularity, fraud or other corrupt practices. The second section of the resolution related to the prohibition of brewery owners, stockholders therein, saloons, saloon owners, and all others connected directly or indirectly with the liquor traffic, from contributing to campaign funds to influence elections, and also prohibiting persons from receiving, using, or disbursing funds so contributed by those engaged in the liquor traffic. The remaining sections of the resolution referred to legislation in regard to the sale of liquor in some form or another. The Governor refused to respond to this request and declined to submit the matters therein mentioned for the action of the Legislature. Concurrent resolution No. 1 was abandoned by the Legislature. To meet this refusal of the Governor, each branch of the Legislature acted independently in the appointment of committees.

On the third of August a resolution, not concurrent, was introduced in the House of Representatives by friends of statewide prohibition, providing for the creation of a committee to investigate supposed irregularities occurring at the election held on July 22, 1911. This committee, by the terms of the resolution, was empowered to

investigate whether or not there had been poll taxes illegally secured, or receipts or exemption certificate, etc., issued, and if paid for or issued, by whom paid for and by whom issued, and to whom issued, and who furnished the money for such purposes. It was also empowered to inquire into all violations and evasions of the election laws of the State, and the manner and method of such evasions, and by whom made or instigated. These matters all related to the election held on July 22 in regard to the prohibition amendment. There were other matters mentioned in the resolution to be submitted to said committee unnecessary to enumerate.

The committee was promptly created and given all the power possible to be conferred by the House of Representatives to carry out the purposes of the resolution. This included the issuance of process, its execution and enforcement, and providing for the expenses incurred by the members of the committee. It may be also mentioned as a matter of some materiality that the friends of the amendment recently defeated met at Fort Worth and passed a number of resolutions condemnatory of those who opposed the prohibition amendment, in which many derelictions were charged, intimating corrupt practices, and calling upon the Legislature to cause an investigation to be made in regard to these charges. This occurred two days before the Legislature was to meet at Austin. The convention at Fort Worth adjourned to meet at Austin simultaneously with the convening of the Legislature. On the day the Legislature did convene at Austin, those gentlemen, or a large part of them, met in the city of Austin and held a meeting. Quite a number of the members of the Legislature attended that meeting, that body having adjourned for that purpose, at which meeting practically the same resolutions were endorsed that had been endorsed at the Fort Worth meeting. It is also stated that it was understood or agreed in that meeting that the Legislature should carry out the will and wishes expressed at said meeting. The above is shown by the record in this case. The creation of the committee and its work occurred after the Governor had declined to submit the matters requested in the concurrent resolution No. 1. The consideration "of the advisability of submitting additional questions for the consideration of the Legislature" was but a courteous refusal to comply with request contained in concurrent resolution No. 1 on the part of the Governor. The Legislature so understood and acted.

The committee after its appointment met and began work. Among other witnesses summoned before it was this applicant, who was chairman of the anti-state-wide executive committee, and, as its head, managed the campaign against state-wide prohibition. Many questions were asked of and answered by him. Other questions were asked, which he declined to answer. These cover several pages of the committee's report. It is deemed unnecessary here to set out all these matters. They can be summarized with this statement: He declined to answer questions seeking to elicit information as to who contrib-

uted to the campaign fund of the anti-state-wide side of the issue, and the amount received, from whom received, as well as to whom he paid out the money contributed. Names were suggested in the questions to him, but to all these he firmly declined to give an answer. We may sum up, in a general way, that he did state the money received by him or paid to him for such purpose was not used in violation of any of the laws of the State, or so as to infringe any idea of good morals, or in any illegitimate manner. There are many matters of evidence brought out in the record which brought in review the conduct of the political campaign and incidents thereto pertaining. These are not mentioned, because not thought to be necessary to a decision of this case.

Several questions are presented for discussion. It is not the purpose of this opinion to review all these questions. The first one to be discussed is, did the House of Representatives have authority to appoint the committee it did appoint? Second, if so, did that committee have authority to demand of applicant answers to the questions propounded to him, and were the questions and answers material to the matter under investigation? Both propositions should be answered in the negative. Be it remembered that this was a special and not a regular or biennial session of the Legislature. The scope of the authority of a special session of the Legislature is to be found in section 40 of article 3 of the Constitution, which reads as follows: "When the Legislature shall be convened in a special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session, or presented to them by the Governor, and no such session shall be of longer duration than thirty days."

From this it will be observed that when the Legislature is convened in special session such express limitation is placed upon the power of that body that it can not legislate upon any subject or subjects except those specially designated in the proclamation of the Governor calling the body together, or such as may be subsequently presented to that body by the Governor. This limited rule set out in the above section does not apply to the Legislature when sitting in its biennial session. It will, therefore, be observed there is a marked difference between the power of the Legislature in regular session as compared with its power when sitting in a special session. The Legislature by the terms of article 2, section 1, of the Constitution, is made the lawmaking power of the State. This provision of the Constitution limits that body to legislation, unless there be found some other provision in that instrument authorizing it to exercise other powers and functions such as, among other things, to present articles of impeachment against named officials, or expel members for sufficient cause. It also has power under article 3, section 15, to punish by imprisonment during its session any person not a member for disrespectful or disorderly conduct in its presence, or for obstructing any of its proceed-

ings, provided such imprisonment shall not at any time exceed forty-eight hours.

The question then here is, what may the Legislature do at a special called session in regard to legislation, and for what purpose by concurrent resolution, or a resolution of either House, and for what purpose may either or both Houses appoint committees, and what subjects may be investigated by said committee? To the mind of the writer, these are answered definitely by article 3, section 40. By the express terms of that section, the Legislature is expressly restricted and limited, first, to the passage only of such laws as the Governor has authorized in his proclamation, or in subsequent messages submitted by him; and, second, either or both Houses may have authority to make investigations looking to the enactment of such laws as are within the proclamation or message of the Governor, but the Legislature may not and can not investigate matters for legislative purposes not within the proclamation. Nor would the Legislature have authority to investigate matters the Governor declined to submit to it, and this proposition is intensified when the demand or request has been made upon him and he declines to accede. This, the writer understands, would be the limit of authority on the part of the Legislature to either legislate or investigate matters looking to legislation. This, as before stated, is more than intensified when the fact is taken into consideration that the Governor refused to refer or submit these matters for legislation. It is thought to be a correct statement that the Legislature either in general or special session would have no authority either as a body or through committees to investigate matters for legislation about which that body could not enact laws, and when they were without authority to so enact. It might be concluded as a correct proposition, so far as this case is concerned, that whenever the Legislature has authority to enact laws, it would have corresponding authority to make necessary investigations for the ascertainment of such facts as would be necessary as a predicate for the enactment of laws wherein the matter was then pending and formed a part of the proceedings of that body. These rules apply as well to special as to general sessions, but there must be authority in either event as a predicate for legislative action upon the subject or subjects under investigation, otherwise is could not be considered a part of the proceedings of the Legislature. If the above propositions are correct, then the special session had no authority to appoint the committee to investigate, and the committee so appointed was powerless to investigate matters about which that body could not possibly legislate or take action. It is true, the Legislature is one of the three coordinate branches of the government, and in a general way has power in matters of legislation, but there is to be noted a marked difference and distinction between the scope of power of the regular session and that of a special session of the Legislature. When that body meets in its biennial session, its authority to enact laws and

make investigations is as broad as is the constitutional guaranty of power, to wit: as the law-making department of the government. The limitation of such power is to be found in the terms of the Constitution as expressed or necessarily implied. It is not the purpose here to go into any discussion as to the limitations of express or implied power, but the rule is entirely different when the Legislature meets in special session. In the latter case they have no authority to legislate except as set forth by the Governor in his proclamation, or in subsequent messages sent by him to that body. These propositions being correct, the Legislature was without authority to create the committee before whom applicant was called upon to testify, and the committee was without authority to propound questions or to demand answers from this applicant. The House of Representatives, recognizing they had no such authority, called upon the Governor to submit such matters to them as would justify them in exercising such authority. This he declined. It must be evident then from this action of the Legislature, and the subsequent refusal of the Governor to respond to their wishes, that they had no authority to create the committee and make the investigation, and fully recognized that fact. The committee, under this view, was a body without authority to call witnesses, or to put questions and require answers from them. Their action did not form a part of the proceedings of that body and no obstruction could occur.

It may be stated as a proposition incontrovertibly true, that the Legislature derives its power from the Constitution, and is dependant solely on the Constitution for its existence and authority. Both Houses of such body are but the creatures of the Constitution, and outside of the provisions of that instrument, would and could have no authorized existence. Both Houses act under delegated authority which, in a general way, is confined to legislative matters, except in a few instances where is it otherwise provided, and in no instance could it act as a judicial body unless power is expressly conferred upon it by the Constitution for that purpose. Judicial power is conferred upon another branch of the government to be exercised by it to the exclusion of other branches of the government. It would follow then that the Legislature, in matters within its jurisdiction, would have authority to protect itself against disrespectful and disorderly conduct in its presence as well as for obstructing its proceedings. Some of the books speak of this as inherent power. Had the Constitution remained silent upon the question of the power of the Legislature to punish for contempt, we might be called upon to enter the domain of such inherent power and discuss it, but we are relieved from that by the terms of the Constitution wherein it specifies how and when each branch of the Legislature may punish for contempt for such conduct. If it may be said that the Legislature would have inherent power to punish for contempt, it might also be said that the Constitution recognizes the fact and empowers that body to protect itself under the

circumstances stated in article 3, section 15. That section fixes the limits of jurisdiction, at least it sought so to do by the language employed. To a certain extent, under the terms of section 15, the Legislature may be said to have judicial authority, or rather it may be said it has authority to act in a judicial capacity in ascertaining the facts and assessing the punishment therein prescribed. Whether the power is inherent or not, section 15, article 3, grants authority as well as expressly limits the extent of that authority. It is, therefore, unnecessary to discuss the question of inherent power further than is stated in that section. Such authority then can not be exercised in any instance by the Legislature unless the contempt or punishment was for a violation of something the Legislature had authority to do. There are some fundamental rules that have long since been decided, and have become so thoroughly settled in regard to matters of this sort, that they ought to be held conclusive. First, before a contempt punishment can be inflicted, the body seeking to impose the punishment must have jurisdiction of the subject matter; second, it must have jurisdiction of the person; third, it must have authority to render the particular judgment that is rendered. The correctness of the above rules is not an open question in Texas, and ought not to be debatable anywhere. One of the best considered cases involving these questions is found in an opinion by the then presiding judge of this court in Ex parte Degener, 30 Texas Crim. App., 566. The question here involves the jurisdiction of the authority seeking to inflict punishment. It has been said that jurisdiction is of two kinds, first, the power to determine the particular matter and render some judgment upon the hearing, and, secondly, the power to render the particular judgment which was rendered. There was some conflict in the authorities for awhile upon some of these matters, but this all seems to have faded. Many of the cases cited in support of the above proposition will be found collated in Ex parte Degener, supra. That case has been followed in quite a number of opinions by this court, a few of which will be enumerated: Ex parte Taylor, 34 Texas Crim. Rep., 591; Ex parte Kearby, 35 Texas Crim. Rep., 531; Ex parte Wilson, 39 Texas Crim. Rep., 630; Ex parte Duncan, 42 Texas Crim. Rep., 661; Ex parte Snodgrass, 43 Texas Crim. Rep., 359; Ex parte Lake, 37 Texas Crim. Rep., 656. In Ex parte Duncan, supra, it was held there must be contempt in order to justify punishment for the offense, and the facts must justify the judgment imposing such punishment. "There are three essential elements necessary to render a conviction valid. These are, that the court must have jurisdiction over the subject matter, the person of the defendant, and the authority to render the particular judgment. If either of these elements is lacking, the judgment is fatally defective, and the prisoner held under such judgment may be released on habeas corpus." In addition to the authorities cited, supra, on these propositions, there will be found cited in the report of the Duncan case, the

following cases: Ex parte Tinsley, 37 Texas Crim. Rep., 517; Ex parte Kearby and Hawkins, 35 Texas Crim. Rep., 531; Brown on Jurisdiction, sections 109 and 110; Ex parte Lake, 37 Texas Crim. Rep., 656.

It was further held that "Jurisdiction of the person and subject matter are not alone conclusive, but the authority of the court to render the particular judgment is the subject of inquiry; and if, upon a review of the whole record, it appears that a judgment unwarranted by law was entered, the party thus placed in contempt will be released under the writ of habeas corpus. Same authorities."

Following the above quotation are a great number of cases cited in the opinion in the Duncan case, supra. It has also been held that the judgment is not conclusive upon the question of the authority of the court, or the body imposing the contempt, but where the facts justify it, the court will go behind the judgment and inquire into the facts, and if the facts are such that ought not to justify or permit the particular judgment rendered, then the applicant will be discharged upon writ of habeas corpus. This was expressly decided in Parker v. State, 35 Texas Crim. Rep., 12; Ex parte Juneman, 28 Texas Crim. App., 486. This doctrine was reasserted in Ex parte Duncan, supra.

The leading case in the United States on the question involved in this case is Kilbourn v. Thompson, 103 U. S., 168. That case has been followed in quite a number of cases, and, in our judgment, clearly settles the law in this case in favor of the applicant. It is not the purpose of this opinion to review the Kilbourn case, but it is referred to approvingly as setting forth correct principles of law applicable to the questions here involved. See 7 Am. & Eng. Ency. of Law, 62-65, and notes for cases.

It would follow from what has been said that the Legislature not having power to legislate upon matters about which the investigation was had at the called session, that the action of the House creating the committee was without authority, and this being true, the committee would not have power to make the investigation, call witnesses before it, ask questions or demand answers. If the House was not authorized to legislate upon any of the matters about which the investigation was made, it would necessarily follow that that body could not impose punishment for contempt upon the refusal of the witnesses to appear before the committee, or appearing, refuse to give testimony sought to be elicited. It would be clearly beyond the jurisdiction of the committee and of the Legislature, and, therefore, the rules above set forth would apply, that is, that body would have neither the jurisdiction of the subject matter, of the person, nor the authority to render any judgment, much less the judgment it did render. From this viewpoint of this record, the applicant is entitled to his discharge.

In regard to the second original proposition, it may be said, conceding the Legislature had authority to appoint the committee, and

the committee had jurisdiction of the subject matter by virtue of its appointment by the legislative body, and had jurisdiction of the person of applicant by having him before the committee, still there would be authority wanting under this record justifying them in imposing the punishment for contempt. The matters inquired about were such matters as did not require applicant to answer and could form no basis of a judgment. They suggested no violation of any law of this State, and if it did, the Legislature was not authorized to investigate violations of law; that belonged to the judicial department; nor could applicant be required to criminate himself. They were matters not necessary in any way to aid the legislative body in reaching a conclusion on any matter submitted to it by the Governor. That body could not revise the election laws, and could not legally engage in any proceedings tending to such revision, because the Governor had refused to submit such matters to them. It was then nothing before the Legislature to which the answers of the witnesses, whatever those answers might have been, could possibly have been germane. The only purpose for which that Legislature was called was to legislate on specified subjects. It was not authorized to collect data for future legislation, nor with a view of legislating upon any matter not submitted to them, and if it attempted to do so such attempt can not be termed legal proceedings of the House. Being a called session, its power was limited to the thirty days mentioned in the Constitution, and exclusively to the questions mentioned by the Governor in his proclamation calling them together, and in such communications as he might subsequently make. These constituted the only proceedings to be indulged by the Legislature. It would hardly be contended seriously that this Legislature could sit longer than thirty days for any purpose. The Constitution had put a limit to its existence at the expiration of the thirty days. This clause, section 40, article 3, in regard to thirty days limit, is no more binding than other clauses of the same section. It will be observed then that the rule governing the power of a special session is the reverse from the rule that controls the general session with reference to legislative authority. One is general, the other is specifically restrictive and restricted.

There is some intimation that the Governor, after the committee had been organized, sent a communication asking an increase in the appropriation bill from what it had theretofore been under previous appropriations, looking to the enforcement of the law. That message was to the effect that he desired an increased appropriation from what had theretofore been given. By no stretch of reasoning could this matter justify the action of the committee here under discussion. Theretofore the Legislature had been appropriating less than the amount of money requested by the Governor. This request from the Governor was for an increased appropriation to the amount of $27,500. Without placing it upon the ground directly or indirectly that the message was subsequently sent in by the Governor, that,

therefore, the committee could not extend its jurisdiction to that matter, because of its original illegality, it is too clear for discussion that this did not justify the committee in its course of investigation of the July election. It was but an item of appropriation which was asked by the Governor to be enlarged from what it had theretofore been, and for the purposes of prosecuting before the courts those who were violators of the law. We hardly think it would be contended either seriously or otherwise that that matter would justify the committee in their action. I have written beyond what I had intended, and perhaps more than is necessary.

For the reasons indicated, we are of opinion that the applicant is illegally restrained of his liberty. It is therefore ordered that he be discharged from custody. There are other questions presented, but the above matters discussed dispose of the case.

*Relator discharged.*

Prendergast, Judge, dissents.

HARPER, Judge (concurring).—Having expressed my views so fully in the case of Ex parte Gray, this day decided, I hardly deem it necessary to write an opinion in this case, but inasmuch as I do not concur fully in the opinion of either Judges Davidson or Prendergast herein rendered, both of which have been written since I wrote the opinion in the Gray case, it may not be amiss for me to briefly state my views.

I do not concur in the opinion of Judge Davidson wherein he holds that at a special session the Legislature would not have authority to create this committee. The Legislature fully appreciated it had no right to enact laws in regard to amending the election law, or they would not have petitioned the Governor to submit this question, but the right of petition is one guaranteed by the Constitution, and when they had decided to petition the Governor, it was not amiss for them to seek to obtain information to enable them to act promptly. Judge Davidson is in error wherein he alleges the Governor informed the Legislature he would not submit the question. In answer to the petition to submit this question, the Governor informed the Legislature, "When the appropriation bill is passed, the Governor will consider the advisability of submitting additional questions for the consideration of the Legislature." (Page ——, House Journal.) Instead of refusing, this was a promise that he would *"consider the advisability"* of submitting these questions, and if the Legislature, through a committee, sought to elicit information to impress upon him the necessity of such legislation, it was within the scope of their authority. The Legislature at a special session has all the power it has at a regular session, except that which is inhibited by the Constitution. Section 5, of article 3, of the Constitution, provides that the Legislature shall meet every two years, and at other times when convened by the Governor. If this was all, there would be no limitation on their au-

thority at a special session, which would not also apply to a regular session. However, in section 40, of the same article, it is provided there shall be no *"legislation"* upon subjects other than those designated by the Governor. This is the sole limitation upon their power at a special session, and as shown in the Gray case, this word has a well defined meaning in law—the passage of laws, the repeal of laws, or the amendment of laws. The Legislature recognized this limitation and petitioned the Governor to submit this matter. This they certainly had the right to do, and it has never been considered that this limitation narrowed their power to limits it is now sought to confine it. At every special session of the Legislature resolutions have been passed not mentioned in the proclamation of the Governor. In 1910, at a special session, the Legislature provided by resolution for the removal of the body of Stephen F. Austin, and to pay therefor out of the contingent fund. No one questioned their authority, and for a number of years the Legislature at every special session has passed resolutions not mentioned in the proclamation of the Governor, and no one questioned their right to do so. The Thirty-First Legislature provided for an investigating committee to sit in vacation, and examine into penitentiary affairs and recommend legislation, and the Governor was so impressed by the evidence and recommendations that he convened the Legislature in special session and submitted the enactment of laws on this question to them, and if the Thirty-Second Legislature thought the election laws needed amendment, it was within its province to gather information, and thus seek to impress the Governor with the necessity for such laws, and if the investigation had so impressed the Governor, we are impelled to believe he would have submitted the question, for, instead of refusing to do so, he told the Legislature he would consider the advisability of doing so. At least, they had the authority to gather and preserve the information for future use. And in so far as the House Committee is concerned, we do not think anyone can seriously question its right to appoint one, or that the committee was legally constituted. Section 8, of article 3, provides that "each House shall be the judge of the election and qualifications of its members," and subdivision 8 of the House resolution provided for this committee to *investigate the election and qualifications of its members.* That they had this right none can gainsay. This is discussed at length in the Canfield case, referred to in the Gray case, and in the opinion of Judge Prendergast in this case, and recently at a special session of the United States Senate by simple resolution it provided for a committee to investigate the election of Senator Stephenson, and this committee has been conducting this investigation in vacation. We think to hold that the House did not have the right to appoint this committee is not only against the weight of authority, but is in the face of all the authorities.

Again, we do not agree with Judge Davidson when he holds that "the matters inquired about were such matters as did not require

the applicant to answer." Neither do we agree with Judge Prendergast that "all the matters inquired about were matters that the Legislature was authorized to inquire into." As said in the Gray case, we hold that the Legislature would have the right to obtain information which would enable it to correct any evil that might exist, upon which they would be authorized to control or regulate. The information sought must be such as they, in their legislative capacity, would have a right to correct, and the information obtained must be such as would aid them in arriving at a correct conclusion. Relator was asked the question: "Will you state the character of expenses made by you in a general way?" The Legislature has the right to legislate upon elections, and limit the purposes for which money may be spent, and this question we think they had a right to ask, and it should have been answered. Again, the question: "Will you state the amount expended in preparing, mailing, and distributing campaign matter?" was a proper question, for the Legislature would have the right to limit the amount to be thus expended in an election. But the questions which sought to elicit information as to what individuals contributed to the fund, or the amount of such contribution, were improper, for the Legislature would not have the right to prohibit an individual from contributing, unless it should prohibit all individuals, and in seeking to obtain the names of the contributors, it was seeking information which it had no right to demand. We have referred to these isolated questions to make our holding clear, that the information sought must be such as the Legislature would have the right to regulate or control by law, and when the questions go beyond that scope, they are seeking what they have no right to demand. Others might be quoted, both pro and con, but we refer to these to make our holding clear.

In the third place, we do not agree with Judge Prendergast wherein he holds that failure to answer a question propounded by an investigating committee is "obstructing the proceedings of the Legislature." We have read carefully the cases cited, and in all of them that so hold, it is so held on the ground that they have this "inherent power," because the English parliament has always exercised this power. In none of the cases did the States, wherein it is so held, have a Constitution worded as is ours—*"and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."*

In the New York case, People v. McDonald, 99 N. Y., 463, it is expressly stated that the Constitution of that State has no such provision. In the South Carolina case, 74 S. C., 466, it is held that even a committee has the power to exercise this judicial authority. No other court so holds, but even in that case it is held that the committee must act within the limits prescribed by the Constitution.

In the Massachusetts case, 120 Mass., 120, it is held that the Leg-

islature of that State had the power, on the ground that "each House of the British Parliament had the largest power to punish every description of contempt of its authority." . . . "But, according to the decisions of most eminent judges, either branch of a colonial Legislature has no such power of punishment; Kielley v. Carson, 4 Moore P. C., 63; Hill v. Weldon, 3 Kerr. N. B., 1; even for refusal to attend as a witness when duly summoned; Fenton v. Hampton, 11 Moore P. C., 347; Falconer, L. R. 1 P. C., 328—unless by established usage; Beaumont v. Barrett, 1 Moore P. C., 59; or by express act of the imperial parliament. Dill v. Murphy, 1 Moore (N. S.) 487. Speaker v. Glass, L. R. 3 P. C., 560. So in Ex parte Brown, 5 B. & S., 280, the Court of King's Bench held that the House of Keys, which was the lower branch of the Legislature of the Isle of Man, and had also judicial functions in appeals from the verdicts of juries, had no power to commit for contempt, when acting in its legislative capacity.

"It is universally admitted that by the law of England a town or city council had no power, without express act of parliament, to make an ordinance with penalty of imprisonment, or to commit for contempt of its authority. Grant on Corp., 84-86. Parke, B., in 4 Moore P. C., 89; Barter v. Commonwealth, 3 Penn., 253.

"The British parliament has supreme and uncontrolled power, and may change the Constitution of England, and repeal even Magna Charta, which is itself only an act of parliament. But in this Commonwealth the legislative, as well as the executive authority and the courts of justice, is controlled and limited by the written Constitution, and can not violate the safeguards established by the twelfth article of the Declaration of Rights. Emery's case, 107 Mass., 172.

"In the United States, each branch of a Supreme Legislature has the same power to commit for contempt as either house of parliament. Such a power has been adjudged to be inherent in the federal Senate and House of Representatives, although not expressed in the Constitution. Anderson v. Dunn, 6 Wheat., 204. A like power doubtless exists in each branch of the General Court of Massachusetts, and of other State Legislatures, which are supreme within their sphere, and not, like the colonial assemblies of Great Britian, created by and subordinated to the national Legislature. Burnham v. Morrissey, 14 Gray, 226; State v. Matthews, 37 N. H., 450; Falvey's case, 7 Wis., 630.

"But in Anderson v. Dunn, the court said that 'neither analogy nor precedent would support the assertion of such powers in any other than a legislative or judicial body.' 6 Wheat., 233, 234. To such a subject the words of Lord Coke apply with peculiar force: 'When authority and precedent is wanting, there is need of great consideration, before that anything of novelty shall be established, and to provide that this be not against the law of the land.' 12 Rep., 75.

"At the time of the adoption of the Constitution of the Commonwealth, it was no part of the law of the land that municipal boards

or officers should have power to commit or punish for contempts. The second article of amendment of the Constitution, which first conferred upon the General Court 'full power and authority to erect and constitute municipal or city governments in any corporate town or towns in this Commonwealth,' authorized it to grant to the inhabitants thereof such powers, privileges and immunities, 'not repugnant to the Constitution,' as it should deem necessary and expedient for the regulation and government thereof; and provided 'that all by-laws made by such municipal or city government shall be subject at all times to be annulled by the General Court.'

"The city council is not a legislature. It has no power to make laws, but merely to pass ordinances upon such local matters as the Legislature may commit to its charge, and subject to the paramount control of the Legislature. Neither branch of the city council is a court, or, in accurate use of language, vested with any judicial functions whatever. Nor are its members chosen with any view to their fitness for the exercise of such functions. To allow such a body to punish summarily by imprisonment the refusal to answer any inquiry which the whole body, or one of its committees, may choose to make, would be a most dangerous invasion of the rights and liberties of the citizen."

Thus it is seen that in those States holding that the Legislature has such judicial power, it is on the ground that there is no constitutional inhibition, and they possess the inherent power because it was exercised by the British parliament. But in this State we have an inhibition in the constitution, therefore our Legislature has no inherent power to punish for contempt, and it can not do so except in cases where specifically authorized, for as said in the Massachusetts case, "Neither branch is a court, or vested with judicial functions. Nor are its members chosen with any view of their fitness for the exercise of such functions. To allow such a body to punish summarily by imprisonment the refusal to answer any inquiry which one of its committees may choose to make, would be a most dangerous invasion of the rights and liberties of the citizen." And in Rapalje on Contempt it is said: "The two houses of the English parliament and the Legislatures of the several States have this power, except when restricted by constitutional limitations," citing authorities. In this State we have constitutional limitations.

From judicial and legislative history, and from personal knowledge, the writer knows that the Senate and House each keep a daily journal, recording its proceedings, and that in the past it has never been considered that the proceedings of an investigating committee were *proceedings of the House or Senate,* and such proceedings do not appear in the daily journal of proceedings of either House. Investigating committees sit while the Legislature is in session, and while it is not in session, and by no stretch of imagination can the proceedings of an investigating committee sitting in vacation be con-

sidered "proceedings of the House while in session," and it can not be proceedings of the House in one instance and not in another.

Those cases that hold the Legislature has this power, hold that it is sitting as a court, and that no other tribunal has the right or authority to inquire into its judgments, but they are final, and even though the questions may invade the rights guaranteed the individual by the Bill of Rights, and are such questions as they have no authority to ask, yet their judgment is final, and the citizen must suffer the penalty. To this doctrine we can not give our assent. Our government was so framed that no individual or department of government could act tyrannical and take from the citizen his liberty without just cause. The executive can not promulgate a law and have the citizen tried and punished, and if he should do so, this court will relieve against such arbitrary acts. The legislative branch can not invade the Constitution and if it does, we will restrain. This court can not act tyrannically, for if so, the Governor is given power to relieve by exercising the pardoning power. Absolutism has but little place in our form of government, and being of the opinion that the Legislature is prohibited from exercising judicial power, except in those instances wherein therein authorized, and that it has no power to punish for contempt except in the instances authorized in section 15 of article 3, we are constrained to the opinion that relator should be discharged. In Rapalje on Contempt it is said: "In this country the courts have unquestioned power to decide upon the validity of the commitment for contempt by a legislative body; i. e. to pass upon the question whether the Legislature acted within its jurisdiction in the particular case, but in England the doctrine of the omnipotence of parliament shuts the door to such inquiry, and each house of parliament is the exclusive judge of the contempt of its own authority," citing many authorities to be found on page 4. We are truly glad that no department of this government has been held to be *"omnipotent."*

This question has not been one easy for us to solve. We read the authorities before writing the Gray opinion. Since Judges Davidson and Prendergast have written their opinions, we have again reviewed the authorities, and, while reluctantly, yet we are forced to the conclusion that our Legislature has no right to adjudge one guilty of contempt in this character of proceedings, for failure to answer a question propounded by an investigating committee, is not an "obstruction of legislative proceedings" during its sessions.

PRENDERGAST, Judge, (dissenting.)—Some of the legal questions to be decided in this case are identical with those in the Gray case, a companion case to this, and this day decided. But there is at least one additional feature in this, that is not in the Gray case. The main facts on the common questions are substantially the same

in both cases. Yet, as there are some differences, and there are additional facts on the additional feature in this, not in the Gray case, I deem it of sufficient importance, if indeed it is not essential, to give the full facts in this case. It is, of course, to be regretted that this statement will necessarily be quite lengthy.

It was agreed by all parties and their attorneys on this hearing that the journals of this special session of the Legislature should be considered in evidence, and they were introduced in evidence. This court could, and would, take judicial notice of them and their contents in this case whether introduced or not. Every person can see them and know of their contents even though no portion should be copied herein.

Under section 8, article 4 of the Constitution of this State the Governor by proclamation of June 20, 1911, convened the Thirty-second Legislature in special session on July 31, 1911, for these purposes stated therein: 1. To make appropriations to run the government for the fiscal years beginning Sept. 1, 1911 and 1912. 2. To apportion the State into Senatorial and Representative Districts. 3. "To consider and act upon such other matters as may be presented by the Governor, pursuant to sec. 40, art. 3 of the Constitution of Texas." (House Journal, p. 2.) Said Legislature duly convened as called and on the first day duly organized and adjourned to the next.

The first thing done by the House after formally opening and making announcements the next day, Aug. 1st, was the introduction by some of the members of this resolution:

"REQUESTING THE GOVERNOR TO SUBMIT SUBJECTS FOR LEGISLATION. Mr. Maddox offered the following resolution: House Concurrent Resolution No. 1, requesting the Governor to submit certain subjects for legislation at the present called session.

"Resolved by the House of Representatives, the Senate concurring, That the Governor of this State be and he is hereby requested to dsignate and present to the present Called Session of this Legislature, for the consideration of the Legislature and for legislation, the following subjects:

"First—Legislation amending the election laws of this State so as to provide against illegal payment of poll taxes, and to enact such further laws as may be necessary to safeguard the ballot boxes and secure fair and honest elections without a taint of irregularity, fraud or bribery.

"Second—Legislation prohibiting breweries, brewery owners and stockholders therein, saloons, saloon owners and all other persons connected, directly or indirectly, with the liquor traffic in this State, from contributing to campaign funds to influence elections, and to prohibit all persons within this State from receiving, using or disbursing such funds as may be so contributed by the liquor traffic, its associations, subsidiaries or persons connected therewith, and to provide adequate and effective penalties for the violation of such law.

"Third—The enactment of suitable legislation requiring all persons engaged in the sale of intoxicating liquor to close their places of business from seven (7) o'clock p. m. until six (6) o'clock a. m. and to keep the same closed, and to provide suitable penalties for the sale of intoxicating liquors by such persons doing business in this State in violation of such law.

"Fourth—Legislation prohibiting the sale of liquor within this State in unbroken packages and quantities less than one quart, and prohibiting the same from being drunk on the premises where sold, with effective penalties for violation of such law.

"Fifth—Legislation prohibiting the sale of intoxicating liquors within ten miles of any State educational institution, including the State University, that is supported in whole or in part by appropriations from the State's general revenue, and for effective penalties for the violation of such law.

"Sixth—Legislation increasing the license tax on individuals engaged in the retail or wholesale of intoxicating liquors." This was at once referred to one of the House standing committees. On August 2d, the Governor, by special message, submitted two additional subjects of legislation. Neither of these were embraced in the resolutions above (Journal, p. 30).

On August 3d the following preamble and resolution were offered by members of the House:

"PROVIDING FOR INVESTIGATING COMMITTEE. Mr. Gilmore offered the following resolution: Whereas, it has been charged by the Executive Committee of the Statewide Prohibition Amendment Association, through a report made by a subcommittee of such Executive Committee, which said report was signed by the following named citizens of Texas as members of said subcommittee: Thos. H. Ball, B. F. Looney, Thomas B. Love, W. J. McDonald, Cullen F. Thomas, D. E. Garrett, R. Harper Kirby, Jack Diss, W. T. Bartholomew, T. G. Harris, William E. Hawkins, B. H. Powell, J. S. Crumpton and Richard Mays, that in the recent election held in this State on July 22, 1911, there were many fraudulent and illegal ballots cast and other methods of fraud and evasion of the election laws resorted to at said election, and other charges made concerning the purity of the ballot box; and

"Whereas, Such committee charges that they have gone far enough into an investigation of such election to convince them to a moral certainty that the result of the election of July 22, 1911, does not represent the verdict of a majority of the qualified voters of the State lawfully entitled to participate in the election; and

"Whereas, Such committee charges that evidence has been submitted to them which convincingly shows that at the very inception of the contest over the Statewide prohibition amendment and in preparation therefor, that the liquor interests entered into a widespread conspiracy to control the election by the use of very large numbers of

poll tax receipts illegally issued, and that where sworn officers of the State, such as tax collectors, could be reached, poll tax receipts were procured directly from their offices and mailed to voters who had never applied for them, or made the necessary affidavits, although the receipts issued therefor showed upon their face that all the requisites of the law had been complied with; and

"Whereas, It is further charged by said committee that in a number of counties it was the practice to have deputies, in some instances negroes, to go out and solicit the payment of poll taxes, their services being paid for by the liquor interests, which also paid for the poll tax receipts; and

"Whereas, It is further charged by said committee that in one county, and in òne box in one section of the State, about one hundred (100) poll tax receipts were shown to have been paid for by the local agent of the breweries, while in another county in another section of the State, it is charged that the tax collector turned over his book containing the poll tax receipts to saloon keepers, who in turn issued some seven hundred (700) such receipts, signing the name of the collector thereto, one of the saloonkeepers being a negro; and

"Whereas, It is charged by said committee that in another county of the State some four hundred (400) poll tax receipts were issued and kept in a convenient safe to be used at the time of said election, and that in the same county one negro handed in three (3) poll tax receipts as his authority to vote, and that one negro, killed by a train just before said election, is shown to have had thirty (30) poll tax receipts on his person, with blank for name of voter unfilled, but which receipts were signed by the tax collector; while it is charged that in another county a Mexican leader approached the prohibition manager and showed that he was in control of twenty (20) poll tax receipts and offered to deliver that number of Mexican votes for five dollars ($5.00) per head, which offer the prohibition manager declined, and had the Mexican leader arrested; and

"Whereas, It is further charged by said committee that in one county deputies were sent out who issued large numbers of poll tax receipts, receiving in turn therefor a paper token which was cashed by the liquor dealers so that the money therefor could be returned to the State and city tax collector, and that in a number of counties such committee received · evidence that negroes in possession of poll tax receipts had admitted they were given to them or had been sent to them and which they had not paid, and for the issuance of which they had given no order; and

"Whereas, Said committee charges that they could multiply instances of like kind and character, and other evidences of irregularity and fraud, and state that they give their assurance that the reports and · facts before them will be available at proper times and places; and

"Whereas, Said committee states that they have inquired into, as

fast as they could, the Mexican vote, and that the law and other efforts will not reach a very large number of this class of voters voting, and that the worst condition of this character found expression in the returns from Zapata County, a county of this State; and

"Whereas, Said committee charges that their reports show a goodly number of boxes in the rural precincts in the wet districts where the failure of a law to require exemption certificates, as in large cities, gave fraudulent opportunities for voting; and

"Whereas, Said committee further charges that conservatively more than eighty (80) percent of the negro vote of the State was controlled by the liquor traffic by corrupting many, by the basest appeals to their fears and prejudices, by threats of their reinslavement and disfranchisement, by money and whisky and the payment of their poll taxes; and

"Whereas, Said committee further charges that judicial investigations just before the election were hampered in every way by those indirectly interested in the preservation of the liquor traffic or their hirelings, but disclosed in a number of sections of the State, notably Austin, its capital city, that gross irregularities and violations of the law had been committed in the matter of issuance and payment of poll taxes, and that these investigations were everywhere hindered and delayed by methods that could not be condemned in terms too severe, and that in nearly every instance saloons were directly connected with such methods; and

"Whereas, The aforesaid committee in its published report charges that the conditions reported to such committee and the facts submitted to them imperatively demand that the Legislature should at once institute a most rigid investigation and that they appeal to that body to use all the agencies at its command for the purpose of securing testimony and facts in every section of Texas where they can be had looking into the matter of fraudulent voting, poll tax paying, the use of money and the connection of the liquor traffic therewith; and

"Whereas, Said committee charges that the facts that will be available to a legislative committee will amply warrant the expenditure of any sum that is appropriated for the purpose alone of providing as fast as possible against the recurrence of such conditions that have made possible the official returns upon the constitutional amendment, by enabling the lawmaking body to throw further safeguards around the conduct of all future elections; and

"Whereas, Said committee charges that the will of the people in the matter of amending their State Constitution has been subverted and overthrown by the shameless use of an unlimited corruption fund contributed by the liquor interests; all of which foregoing charges and others connected therewith are shown in a copy of the report of said committee given to the press, which copy is herewith attached and marked 'exhibit A;' and

"Whereas, the preservation of free government and of the right of the people to control their governmental affairs depends upon maintaining and safeguarding the purity and freedom and honesty of the ballot and the uncorrupted independence of the voters—in short, upon a patriotic and uncorrupted ballot properly safeguarded so as to secure it against any improper influence and to insure that it will be counted as cast by the voter; and

"Whereas, The laws of this State regulating elections have been recently enacted and changed many times during recent years, and are in need of revision and amendment, as has been generally admitted by many eminent citizens familiar with such laws and their operation; and

"Whereas, The conduct of the election held on the 22d of July, 1911, will, if investigated, place this and future Legislatures of Texas in possession of information which will be very valuable for the purpose of promoting the formulation and passage of such laws as will properly safeguard the purity, freedom, and honesty of the ballot and insure that it will be counted as cast and returns of election made in accordance with the ballots as cast; and

"Whereas, It is charged and believed by a great number of citizens, and has been published in many newspapers throughout the State, that large sums of money were used to influence the result of the election held on July 22, 1911, and the manner in which such money was used and the large amount alleged to have been used, has been challenged and criticised as having been improper, unlawful, and against sound public policy; which charges, if true, demand further legislation that will prohibit the corruption of the ballot; and

"Whereas, Section 4 of article 6 of the Constitution of this State provides: 'In all elections by the people the vote shall be by ballot, and the Legislature shall provide for the numbering of the tickets, and make such other regulations as may be necessary to detect and punish fraud, and preserve the purity of the ballot box;' and

"Whereas, It appears that the laws passed in pursuance with this constitutional provision have, if the charges heretofore referred to are true, proven inadequate to protect the purity of the ballot box; and

"Whereas, It becomes of vital importance to this or any subsequent Legislature, which may legislate for the purpose of carrying out this constitutional provision, that the methods used to evade and violate the laws and destroy the purity of the ballot box be known in order that adequate laws preserving the purity of the ballot box be enacted by this or a subsequent Legislature, and the evidence of the violations and evasions of the laws preserved for the assistance of this or any subsequent Legislature which desires to legislate to protect the purity of the ballot box; and

"Whereas, Unless an investigation be now made, much of the testimony and evidence of fraud, corruption and evasion will be destroyed and become inaccessible. Therefore, be it

"Resolved by the House of Representatives of the Thirty-Second Legislature that the Speaker of the House be authorized, and that he do immediately upon the passage of this resolution appoint a committee of nine (9) members of the House of Representatives, at least six (6) of whom shall be favorable to the adoption of the State-wide prohibition amendment recently voted upon on July 22, 1911, which committee shall investigate and determine and report to the House:

"(1) As to whether or not there were any poll taxes illegally paid or receipts or exemption certificates illegally issued within this State, and if paid, or issued, the method and manner by which the same were paid or issued, and by whom issued or paid, and for and to whom paid or issued, and by whom the money was furnished for such purpose.

"(2) All violations and evasions of the election laws of this State, and the method and manner of such violations and evasions, and by whom the same were made and instigated.

"(3) Whether or not money was corruptly and unlawfully used in any manner by anyone to influence the result of the election held on July 22, 1911, by whom same was used, how the same was used, and by whom, to whom and how same was furnished.

"(4) Also to determine, if any, the amount of money used to influence the result of said election, and the amount expended in such election by any person, corporation, association of persons, or by any organization maintaining a State, county, or precinct headquarters or organization, and by whom the same was used and how the same was used, and by whom, to whom and how the same was furnished and used.

"(5) To investigate and determine whether or not a conspiracy or agreement was entered into by and between any persons or corporations to corrupt the electorate and debauch the ballot box.

"(6) Also to investigate all the charges heretofore referred to in the preamble of this resolution in so far as such investigation will elicit information which will enable the Legislature to amend and strengthen the present laws and pass new and additional laws to detect and punish fraud, and preserve the purity of the ballot box.

"(7) Also to investigate whether or not there exists in this State an organization of any kind furnishing or expending money to improperly influence elections in this State or legislation in this State such as would contravene sound public policy, and what legislation may be necessary, if any, to remedy such evils.

"In addition to all of the power necessary to carry out the full and complete terms of this resolution, said committee appointed hereunder shall have all of the authority conferred by law under chapter 7, of the Acts of the Thirtieth Legislature, which were passed at the regular session of the Legislature, and shall act under this resolution and under such Act of the Thirtieth Legislature referred to.

"In addition to the power conferred by the Act of the Thirtieth

Legislature above referred to relating to punishment for the refusal to obey any process issued by this committee, anyone refusing to be summoned or anyone evading any process issued by said committee, or anyone who shall refuse to appear before said committee in person, or to produce any books, papers, letters, telegrams, or other things called for and demanded by said committee, shall be held to be in contempt of this House and shall be brought before the bar of this House for such contempt, and shall there be dealt with as the members of this House may deem necessary.

"All the necessary expenses incurred by the members of the committee, or incurred under its direction and in pursuance of this investigation, shall be paid out of the contingent expense fund of the House.

"The name and title of the committee herein appointed shall be the House Investigating Committee, and such committee shall elect its own chairman and such other officers as it may desire, and establish and make such rules for governing its own procedure and forms of process as may be permitted by law.

"Such investigating committee shall cause the testimony of all witnesses to be taken by competent stenographers, question and answer, and shall make a report to the House at this session of the Legislature, and shall accompany such report with the evidence taken by it, and its recommendation for such changes in the present election laws and for the enactment of such new laws as the evidence adduced and the facts developed may demand for the preservation to the people of their constitutional right of a pure ballot box."

I think it unnecessary to copy "Exhibit A" attached and called for in the preamble to these resolutions. However, besides those named as signers, it was signed and approved by some thirty-seven of the most prominent citizens of Texas, as the other members of the State Executive Committee of said Amendment Association, and the whole of said resolutions are on pages 36 to 43 of the House Journal. After consideration thereof, on August 5, the following amendment was added to the resolution last above copied:

"8. Also to investigate all charges heretofore referred to in the preamble hereof, and other pertinent charges, for the purpose of determining whether or not money, or anything of value, or any reward or promise of reward, or compensation or promise of compensation of any character, has been improperly used in this State for the purpose of securing or affecting in any way the election or qualification of the members of the House of Representatives; and to determine whether or not by reason of any or all of said charges the truth of which may be established, or any or all facts that may be established under any or all of the preceding divisions of this resolution clause, there exists in this State a conspiracy, or formed purpose, or design, improperly to control, secure or affect, in whole or part, the election or qualifications of the members of the House of

Representatives," and then the whole was adopted by the *House on August* 5 (Journal 68-9). On the same day the Speaker duly appointed this Investigating Committee.

*These resolutions were not acted upon by the House until after the Governor had sent the message now shown.*

*Before this resolution was acted upon or adopted by the. House, the Governor sent to the House this message and proclamation:* "Executive Office. Austin, Texas, Aug. 5, 1911. To the Texas Legislature: "In the appropriation bill passed by the Thirty-First Legislature there is an item which reads as follows: 'Payment of rewards and other necessary expenses for the enforcement of the law.......... $7,500.'

"The foregoing sum was appropriated for the fiscal year ending August 31, 1911, for the purpose named. There remains unexpended a balance of $5,815.19, which is available for the enforcement of the law.

"It is alleged that irregularities and frauds were committed in the recent election on the proposed amendment to the State Constitution prohibiting the manufacture and sale of intoxicating liquors in Texas.

"It is also charged that in different counties and localities individuals and county officials violated the law regulating the payment of poll taxes.

"The Constitution of the State makes it the duty of the Governor to see that all laws are faithfully executed. I am determined to employ all means and agencies at the disposal of the Governor to investigate the alleged frauds and prosecute any and all offenders. It has been the universal practice of the Legislature to appropriate money to the Governor for the payment of rewards and other expenses necessary for the enforcement of the law. I respectfully recommend to the Legislature that this item in the pending appropriation bill be increased for the fiscal year beginning September 1, 1911, to $27,500. It has been suggested that I recommend to the Legislature an extra appropriation for the purpose of investigating violations of the poll tax and election laws, and the enforcement of same against the offenders, and that if I would do so an effort would be made to raise an additional sum of $10,000 from prohibitionists and anti-prohibitionists for the purpose of securing an enforcement of these laws. I do not believe we should rely upon such public contributions, but if the law has been violated, it is the duty of the Governor to see that it is enforced. It is equally the duty of the Legislature to furnish me with means to enforce the same.

"I have issued proclamation offering a reward of $50 for the arrest and conviction of any person or persons guilty of fraudulent acts against the poll tax law, or guilty of fraudulent irregularities in the recent prohibition amendment election. I attach a copy of this proclamation hereto and make it a part of this message.

"I urge upon the Legislature, therefore, to increase the appropriation for the enforcement of the law in the sum mentioned, that I may not be embarrassed for the want of funds to prosecute those guilty of frauds against the statutes named.  Respectfully submitted,

O. B. Colquitt, Governor of Texas.

## "PROCLAMATION BY THE GOVERNOR OF THE STATE OF TEXAS.

"$50 Reward.    To all to Whom These Presents Shall Come: Whereas, It has been publicly alleged and charged that various and sundry persons, not named, in various and sundry counties and localities in Texas, not mentioned, have violated the law regulating the paying and issuing of poll tax receipts; and

"Whereas, It is alleged and charged without naming the persons and places, that gross irregularities and frauds were practiced in the holding of the election on July 22, on the proposed amendment to the Constitution of the State of Texas prohibiting the manufacture and sale of intoxicating liquors in this State; and, Whereas, Under the Constitution it is made the duty of the Governor to see that all laws are faithfully executed; Now, therefore, by virtue of the authority vested in me by the Constitution and laws of this State, I, O. B. Colquitt, Governor of Texas, hereby offer a reward of $50 for the arrest and conviction of any person guilty of fraudulently paying for poll tax receipts, or any person fraudulently issuing the same, and by virtue of the authority vested in me by the Constitution and laws of this State, I offer a reward of $50 for the arrest and conviction of any person holding the election and making returns of same who may be guilty of fraudulent acts against the election laws of this State or the purity of the ballot, or any person guilty of unlawfully intimidating legal voters.

"In testimony whereof, I have hereto signed by name, and caused the seal of State to be affixed at the city of Austin, Texas, this, the the day of August, A. D. 1911.

O. B. Colquitt, Governor of Texas.

By the Governor:

C. C. McDonald, Secretary of State."

*On August 7* the committee to which was referred the above first copied resolution, reported a substitute therefor, as follows: "The Speaker laid before the House, for consideration at this time, House Concurrent Resolution No. 1, requesting the Governor to submit certain subjects for legislation at the present called session.

"The resolution, together with the following substitute offered by the committee was read to the House:  Resolved by the House of Representatives, the Senate concurring, that it is the sense of this Legislature that his Excellency, Governor O. B. Colquitt, should sub-

mit for the consideration of the Legislature the enactment of the following laws:

"1. An amendment to the election laws so as to more efficiently provide against the illegal payment of poll taxes and to enact such further laws as may be necessary to prevent, detect and punish fraud and preserve the purity of the ballot box.

"2. Limiting the number of saloons, or retail liquor establishments to not more than one for every fifteen hundred inhabitants, or any fraction thereof over twelve hundred in any incorporated town, city or county, provided that the same ratio shall also apply in unincorporated towns and villages.

"3. Fixing a uniform license fee of not less than $750 and not exceeding $1,000 annually on all retail liquor dealers. 4. Limiting the hours of the, sale of intoxicating liquors from 6 o'clock a. m. until 7 o'clock p. m., and from Saturday, 7 o'clock p. m. until 6 o'clock a. m. the following Monday. 5. Making it a condition in the license for the sale of liquor that the licensee shall not contribute any money or thing of value to any campaign fund, or to secure the election or defeat of any candidate or measure in any election in this State, or to handle or pay out any moneys or thing of value for such purposes, and providing for adequate penalties and forfeitures for any violation thereof. 6. Prohibiting the sale of liquor in this State except in unbroken packages and prohibiting the same from being drunk on or about the premises where sold. 7. Be it further resolved, That we will promptly give consideration to the subjects heretofore submitted and pass upon the same with such expedition consistent with efficient service, to the end that the laws hereinabove set forth may also be considered within the limitations of this special session, and be it further

"Resolved, That this Legislature most courteously request the submission of the laws as above set forth, believing that the great majority of the people of the State favor such submission, and that this Legislature will enact such laws within the limitations as herein specified." And the House on the same day adopted it. (Journal 72.) Substantially the same, if not this identical resolution was adopted by the Senate on August 3. (Senate Journal, pp. 42 to 45.)

These resolutions were, it seems, at once presented to the Governor. On August 9 he sent this message to the House:

"Executive Office. Austin, Texas, Aug. 9, 1911.
"To the House of Representatives:

"House Concurrent Resolution No. 1, expressing the sense of the Legislature that certain subjects named therein be submitted by the Governor for consideration, is herewith returned.

"The Constitution, article 4, section 15, reads as follows: Sec. 15. Every order, resolution or vote to which the concurrence of both Houses of the Legislature may be necessary, except on questions of

adjournment, shall be presented to the Governor, and, before it shall take effect shall be approved by him; or, being disapproved, shall be repassed by both houses; and all the rules, provisions and limitations shall apply thereto as prescribed in the last preceding section in the case of a bill.

"The present Legislature was convened for the purpose of passing an appropriation bill and for the reapportionment of the State into Senatorial and Legislative Districts, and subsequently the questions repealing the automatic tax law, and the fixing of an ad valorem tax rate for general revenue purposes, and for State school purposes, have been submitted by the Executive for the Legislature's consideration and action.

*"When the appropriation bill is passed the Governor will consider the advisability of submitting additional questions for the consideration of the Legislature.*

Respectfully,

O. B. Colquitt,
Governor of Texas."

(Italics mine.)        (Journal 142.)

Under the circumstances, I consider the Legislature had, from this, and the other messages of the Governor above copied, his implied indication, if not promise, that he would yet submit to the Legislature the said subjects for legislation, they petitioned him to submit.

*There is not in the journals anywhere any message or other declaration or statement by the Governor to the House, or anyone else, that he would decline or refuse to submit to the Legislature the said subjects for legislation, which they had petitioned him to submit. I, therefore, think I am fully justified in stating, the Governor did not notify the House he would decline, nor did he decline, to submit to the Legislature the subjects, or any of them, for legislation which they had petitioned him to submit.*

From time to time during this special session the Governor did submit to the Legislature a large number of other subjects—more than sixty in all—for legislation, and did this until within four days of the thirty days the Legislature could remain in session at this special session, and even after Mr. Wolters, was adjudged in contempt and ordered punished therefor. Under the Constitution he had the power and authority to immediately reconvene the Legislature for another special session, and to do so again, and again, at his discretion. This had been done by his immediate predecessor.

As soon as this investigating committee was appointed it began its work for the House as it was required by said action of the House. On August 23 this investigating committee made this report to the House and the House then took the action shown hereby: "Report of Investigating Committee. Mr. Nickels, of Hill, Chairman, submitted

the following report of the committee to investigate the recent prohibition amendment election, which was read to the House:

"Committee Room of the House Investigating Committee.

"August 22, A. D. 1911. To the Hon. Sam Rayburn, Speaker of the House of Representatives of the Thirty-Second Legislature. Sir: Your committee, heretofore appointed pursuant to a resolution adopted by the House of Representatives on the 5th day of August, A. D. 1911, for the purpose of investigating certain matters set forth in said resolution, and acting under authority of said resolution, after having organized as the House Investigating Committee, and after having elected the Honorable Luther Nickels chairman of this committee, and the Honorable H. B. Savage secretary, did, on the 17th day of August, A. D. 1911, issue process for the Honorable J. F. Wolters in due and legal form, which was legally served upon the said witness, commanding him to appear before the House Investigating Committee of the House of Representatives of the First Called Session of the Thirty-Second Legislature, now in session in Travis County, Texas, and then and there to testify relative to such matters as are under investigation by said committee.

"That afterwards, on the 17th day of August, A. D. 1911, the said witness, the Honorable J. F. Wolters, in obedience to said subpoena, did appear before the House Investigating Committee in session and was sworn as a witness by the chairman of the committee and proceeded to testify as a witness before said committee.

"Upon first taking the witness stand, Mr. Wolters asked permission of the committee to read from a manuscript several pages of typewritten matter as his testimony before the committee. Permission was given him to read from said manuscript, which he proceeded to do; after which he was examined by C. M. Cureton, one of the members of this committee, who had been appointed heretofore by the chairman, upon resolution of the committee, to assist in the conduct of the examination of all witnesses.

"In the course of his examination by Mr. Cureton, the said witness was asked the following relevant and pertinent questions, upon which the said witness, J. F. Wolters, declined to answer, and which he still refuses and declines to answer. The witness, Wolters, after having testified that at the convention which met at Houston on October 12, 1908, he was selected as chairman of the anti-State-wide organization of the State, and after having testified in substance that he proceeded to organize the State for the campaign, and after having testified that certain funds had been raised for the purpose of perfecting such organization of the State, and after having testified that he tried to send men to every county in the State to perfect the organization of which he was State chairman, he was asked the following questions:

"Q. Now, these gentlemen who perfected these organizations for

you, I suppose you were compelled to pay them their expenses and somthing for their time in perfecting the organization?

"Then followed the following questions and answers relating to this matter: A. Well, in order to keep the record straight, I will right there decline to answer on the ground that the committee has not the authority to ask that. Q. Well, then, Mr. Wolters, I will take and put the question to you directly, so as to keep the record in proper legal form. A. I want it understood the only reason I am declining to answer is because I do not think the committee has the constitutional authority. Q. All right; please state whether or not these several gentlemen which you had perfecting the county organizations, as has been heretofore described in your testimony, were paid their expenses and anything for their time and services while they were doing this class of work. The Chairman: Do you decline to answer? A. I decline to answer on the ground that I do not think it is within the constitutional authority of this committee to ask that question and require an answer to it. Q. Following up this question, on this line of investigation, Mr. Wolters, I will ask you to state the names of these gentlemen that were doing this work for you, to which I referred in the previous question? A. Not believing that the committee has authority to ask that question, and demand an answer, I decline to answer it. Q. I will ask you, Mr. Wolters, if it is not a fact that these gentlemen were paid their actual expenses and a fixed and agreed salary for the services which they performed? A. For the same reason heretofore given, I decline to answer.

"The aforesaid questions were each and all pertinent and material to the question of the inquiry before the committee, but the said witness, J. F. Wolters, knowingly and wilfully refused to answer the same.

"The witness, J. F. Wolters, having testified that he was chairman of the anti-prohibition campaign in the recent campaign, and that he undertook to organize the State for such purpose, was asked the following questions and made the following answers declining to answer the questions:

"Q. In organizing the State, did you have in your employ any member of the House of Representatives or the Legislature? A. I will decline to answer that question. I don't think the committee has got any authority to investigate that.

"Q. In perfecting your organization and carrying on the campaign, did you make any effort to get those who were opposed to prohibition or submission to run for the Thirty-Second Legislature as against those who were in favor of prohibition or submission? A. I decline to answer that question, because it is not in the province of the committee to inquire into that.

"Q. I will ask you this question, Mr. Wolters: During the campaign just ended, at any time during the campaign, did you have in your employ, or were you paying any funds or compensation to the

Hon. Jeff Cox, a member of the House of Representatives of the Thirty-First and Thirty-Second Legislatures? A. I decline to answer that question, because I don't think it is the province of the committee to ask it or to require an answer.

"Q. Did Mr. Cox make any speeches under your direction or your committee, or under the charge; that is, under the direction of anyone in charge of the work being done by you during the campaign for which he received either his actual expenses or for which he received a compensation in addition to his actual expenses? A. I decline to answer that question for the same reasons as heretofore stated.

"Q. At any time during the campaign just ended and since Mr. Stevens was sworn in as a member of the Thirty-Second Legislature, was he in your employ as head of the anti-prohibition organization during the fight doing work of a political nature, such as visiting the State of Oklahoma and investigating the conditions there relative to the liquor business in that State? A. I decline to answer that question because I do not think it is within the authority of the committee to ask it. If these members had been employed that way it would have been perfectly legal, but I decline, deny the right of the committee to inquire into the management of this campaign—deny the right of the committee to inquire into the management of this campaign.

"Q. Continuing the question relative to Mr. Stevens, did he receive any money or compensation or thing of value, either as expenses or as compensation for his services for performing any of the duties or any work heretofore referred to relative to visiting Oklahoma and the publication of the result of the investigating there? A. I decline to answer that question, for the same reasons as heretofore stated.

"Q. Did you ever have any conversation with him (Representative Stevens), either during the session of the Thirty-First Legislature or afterwards and prior to July 22 of this year? A. Many of them.

"Q. In any of these conversations did you make any offer to him to induce him to go to Oklahoma and make the investigation referred to, or to offer him employment of any character with the anti-State-wide organization? A. I decline to answer that question.

"Q. Did you ever have any conversation relative to employment in a political way in the campaign just past? A. I decline to answer that question.

"Q. Did you ever pay him (meaning Representative Stevens) anything for making speeches in the campaign just past? The speeches he made being made between the time he was sworn in as a member of the Legislature and July 22 of this year? A. I decline to answer that question for the same reasons heretofore given.

"Q. Colonel Wolters, at any time after you took the position as chairman of the anti-prohibition organization, which is to say at any time after October 12, 1908, and prior to the time when Mr. Stevens was sworn in as a member of the Legislature, was he in your

employ as chairman of the anti-prohibition organization in any capacity? A. I decline to answer that question for the same reasons heretofore stated.

"Q. Did Mr. Stevens work for you in the capacity heretofore referred to as an organizer in any of the counties of the State? A. I decline to answer that question for the same reasons heretofore stated.

"Q. Did he or not while working for you receive his expenses and compensation for his labor? A. I decline to answer that question.

"Q. I will ask you, if at any time after October 12, 1908, when you became chairman of the anti-prohibition forces, and prior to the date on which Mr. Stone was sworn in as a member of the Legislature, whether he was in your employ as organizer or otherwise for the anti-prohibition forces for the State? A. I decline to answer that question for the same reasons heretofore given.

"Q. And did Mr. Stone, as such organizer, receive his expenses and any compensation for services as such organizer? A. I decline to answer.

"Q. Or did he receive compensation for any work or labor done by him for your organization between the dates mentioned? A. I decline to answer that question.

"Q. After Mr. Stone was sworn in as a member of the Legislature and prior to July 22 of this year, did he make any speeches or perform any other work for your organization for which he was paid, any compensation whatever? A. I decline to answer that question.

"Q. If he made any speeches and did not receive payment for making the speeches or doing other work, were his expenses paid for making the speeches or for, or in the performance of such work as he did do? A. I decline to answer that question like I will relating to that campaign, its management, or its work.

"Q. Did Mr. Kennedy (referred to Representative A. M. Kennedy) do any work for your organization during the campaign for which he received any compensation? A. I decline to answer that question.

"Q. If he did any work of any character, did he receive his expenses while doing so? A. I decline to answer that question.

"Q. I noticed some time during the campaign quite a lengthy article in the newspaper, attributed to Mr. Kennedy, and I presume prepared and written by him, on conditions in Tennessee relative to the liquor business. I will ask you if you or your organization or anyone for you paid him anything for the preparation of this article? A. I decline to answer that question.

"Q. I will ask you if Mr. Kennedy made a trip to Tennessee, or performed any other character of service during the campaign for which you paid him any compensation of any kind or character? A. I decline to answer that question.

"Q. Did you or your organization or anyone under you pay his expenses while visiting Tennessee, or traveling for you or doing any other labor in any capacity? A. I decline to answer that question.

"That each and all of the foregoing questions were pertinent and material to the question of inquiry before the committee, but the said J. F. Wolters knowingly and wilfully refused to answer the same. The said witness also declined and refused to answer certain other questions, as follows: Q. Colonel Wolters, do you know or could you state either correctly or approximately, the amount which you did expend for campaign purposes in the campaign just closed? A. I decline to answer that question for the reasons heretofore stated.

The witness was testifying with reference to campaign expenses when he was asked the question and made the answer as follows:

"Q. Well, you will go this far in your answer and state the character of expenses made by you in a general way? A. No, sir; I decline to answer that question. I want to keep the record straight.

"Q. Will you state, Colonel Wolters, approximately, or as near as you can now recollect, the amount of money paid out by you for speakers, either as salaries or as expenses? A. I decline to answer that question for the reasons heretofore given."

The witness continuing his testimony, and having testified that Senator Watson assisted him in the management of North Texas headquarters of his campaign, and having testified that Senator Watson was a man of limited means, and that his expenses were paid, he was then asked the following questions:

"Q. Was he or not paid anything in the way of money or other compensation for services in addition to his expenses? A. I decline to answer that question.

"The witness having testified that he was acquainted with Col. Otto Wahrmund, a member of the House of Representatives from Bexar County, was asked the following questions: Q. Do you know whether or not Colonel Wahrmund contributed anything to your campaign fund? A. I decline to answer that question.

"Q. As a private citizen? A. I understand the question to be a citizen, as an individual.

"Q. As a citizen? A. Yes, sir; I decline to answer that question for the reason I don't think it is within the authority of this committee to inquire as to who contributed to the campaign fund.

"Q. I will ask you whether or not anyone in this State who owns stock in a brewery corporation, or any other corporation engaged in the manufacture and sale of beer or other intoxicating liquors, contributed anything to your campaign fund or the campaign fund of any other organization in the State? A. I decline to answer that question for the reasons heretofore stated.

"Q. Did any individual who was engaged in the manufacture of beer, or in the storage or distribution of beer within this State, contribute any money or other thing of value to the campaign fund about which I have been inquiring? A. I decline to answer that

question just like I have declined or- would decline with any man in the banking business or the mercantile business.

"Q. Well, in order to make the question entirely clear, I will separate it and reask a part of it. Colonel Wolters, did any individual or partnership without the boundaries of this State, engaged in the manufacture or sale or distribution of intoxicating liquors of any character, contribute to the campaign fund, the distribution of which was in your hands? A. Please read that question again; I was a little absent-minded.

"Q. Read the question to him, Mr. Stenographer. (Stenographer reads the question.) A. I decline to answer that question.

"Q. Did any of the lodges of the State, the great organization lodges of the State, did they contribute anything so far as you remember? A. Do you mean the secret orders?

"Q. Yes, the secret orders. A. The fraternal orders?

"Q. Yes, sir, the fraternal orders. A. I will decline to answer that question.

"Q. Well, did any of the commercial clubs or Boards of Trade of the cities and towns of the State contribute anything to your campaign fund? A. I will decline to answer that question, too.

"Q. I will ask you, Colonel Wolters, what was the largest campaign contribution made to your organization campaign fund by any individual? A. I will decline to answer that question.

"Q. I will ask you if such individual was a resident of this State or did he reside without the boundaries of the State? A. I will decline to answer that question.

"Q. I do not recall whether I have asked you this question or not: Can you state approximately or accurately, and will you state the total amount of money received by you as campaign contributions for the recent campaign? A. I decline to answer that question.

"The witness having testified as to the expenses incurred by him in printing and mailing out a certain line of his campaign literature known as 'Facts' was then asked the following questions:

"Q. Will you state the amount of expense incurred in preparing, mailing and distributing the campaign matter other than 'Facts?' A. No, sir; I will decline to state that.

"The witness, having testified that Representative Heilig, a member of the Thirty-Second Legislature, had been assisting him in the publicity department of his campaign office at Houston, during a good part of the campaign, and having testified that the expenses of Mr. Heilig were paid by his campaign committee, was then asked the following question:

"Q. Did he (referring to Representative Heilig) receive any funds or compensation other than his expenses? A. I decline to answer that question.

"The witness, having also testified that the Hon. Bob Barker, Chief Clerk of this House, assisted him in the recent campaign at the Dal-

las office, and having testified that Chief Clerk Barker made a trip for him in the campaign to Tennessee, and having testified that Mr. Barker's expenses were paid, was then asked the following question:

"Q. Did he receive any compensation in addition to these expenses?

"A. I decline to answer that question. I think he told you himself.

"All of which said foregoing questions were pertinent and material to the question of inquiry before the committee, but the said witness, Wolters, knowingly and wilfully refused to answer the same or any of them.

"That in the course of the examination of the witness, Wolters, and after he testified that he was chairman of the Anti-prohibition Executive Committee during the campaign of 1911, and after the witness had testified that he knew, by hearsay, or an organization called the 'Texas Brewers' Association,' of which Mr. B. Adoue is treasurer, and after he had been shown what purports to be a copy of a letter dated at Galveston, Texas, in 1911, and which is signed 'Texas Brewers' Association, B. Adoue, Chairman,' calling upon certain parties to donate funds for the purpose of preventing the adoption of the constitutional amendment voted on on July 22, the following questions were asked Mr. Wolters:

"Mr. Adoue, during 1911, did he make any remittance to you of any funds or money to your campaign fund?

"To which question the witness made the following answer: A. I decline to answer that question.

"That said question was pertinent and material to the question of inquiry before this committee, and the said witness, J. F. Wolters, knowingly and wilfully refused to answer the same.

"That afterwards, while the said witness, J. F. Wolters, was still upon the witness stand, he was asked the following questions, which he declined to answer as shown, to wit:

"Q. Did you receive any funds or remittances as a campaign contribution from Mr. Otto Koehler, president of the San Antonio Brewing Association? A. Do you mean from him individually? Q. Yes, sir; from him individually? A. I decline to answer that question.

"Q. Did you receive any remittance or campaign contribution from Mr. H. Hamilton, president of the Houston Ice and Brewing Company? A. I decline to answer that question.

"Q. Did you receive any remittance from Mr. S. T. Morgan, president of the Dallas Brewery, as contribution to your campaign fund? A. I decline to answer that question.

"Q. Did you receive any remittance as a campaign contribution from Mr. H. Bruhn, manager of the Lone Star Brewery? A. I decline to answer that question.

"Q. Did you receive any remittance as a campaign contribution from Mr. Zane Cetti, of the Texas Brewing Association? A. I decline to answer that question.

"Q. Will you state, Colonel Wolters, that none of these individuals,

as individuals, whose names I have just called your attention to, did not contribute to the campaign fund? A. I shall decline to answer that question.

"That each of the foregoing questions were pertinent and material to the question of inquiry before the committee, and the said witness, J. F. Wolters, knowingly and wilfully refused to answer same. The said witness, in continuing his testimony, stated that he was acquainted with Mr. Warnken, of the firm of Kennerly & Warnken, of Houston, whose office is in the Scanlan building in that city, and after having testified that Mr. Warnken was a Republican, he was asked the following questions:

"Q. Well, during the campaign just closed, was Mr. Warnken in your employ, performing any character of service for you? A. I will decline to answer that question for the reason heretofore stated.

"Q. During the campaign, did he or not, visit various counties in the State for the purpose of lining up the local Republicans and the Republican organizations against the State-wide amendment that was to be voted on on July 22? A. I will decline to answer that question for the reasons heretofore stated.

"Q. If he did make such visit and do such character of work, is it not true that he was doing so for you or your organization? A. I decline to answer that question for the same reasons heretofore stated.

"Q. And is it not true that if that work was service, if performed by him, that for this work or service if performed by him, he was receiving his expenses from your organization? A. I decline to answer that question.

"Q. Is it not also true that character of service, if he did do so, that in addition to his expenses he was paid a salary or other compensation by your organization for so doing? A. I decline to answer that question for the reasons heretofore stated.

"Q. I will ask you, Colonel Wolters, if it is not a fact that Mr. Warnken did make a report to you on Coryell County Republicans, the same as appears in this document which I have submitted to you? (Prior to asking the question a typewritten document had been submitted to Colonel Wolters which purported to be, on its face, a report as to the attitude of the Republicans in Coryell County.) A. I decline to answer that question. I don't think it is within the scope and authority of this committee to inquire into that.

"Q. Well, paraphrasing the question suggested by Mr. Hunt a moment ago, I will ask you to state to the committee that you did not receive such a report from Mr. Warnken. A. I will decline to answer that question also.

"This witness, in continuing his testimony, stated that he had reports coming in from precincts and counties over the State somewhat similar to the one shown him, and he was then asked this question: Q. Well, did Mr. Warnken make any of these reports to which you refer? A. I decline to answer that question.

"The witness, after having testified that he had a number of men traveling over the State making reports of the political conditions in the various counties in the State, said number ranging from six or seven to fifteen, he was asked the following question: Q. I will ask you to give the names, if you now remember, whom you employed in that capacity? A. I will decline to answer that question.

"That each and all of the foregoing questions were pertinent and material to the questions of inquiry before the committee, and the said witness, J. F. Wolters, knowingly and wilfully refused to answer the same. The witness was then asked the following questions:

"Q. I will now ask you to state to this committee the amount of the campaign contributions received by you during the recent campaign which ended July 22? A. For reasons heretofore stated, that the committee had not the power and authority to ask that question, nor to receive an answer thereto; I decline to answer that question.

"Q. In the light of the Democratic platform and the utterances contained in the Democratic campaign book, and in the light of the suggestions made by this text-writer tending toward publicity—not endorsing or asking you to endorse the published methods—but in the light of these methods which I have suggested, I will now ask you to state to this committee the amount of campaign contributions received by you during the recent campaign which ended on July 22?

"A. For reasons heretofore stated, that the committee has not the power and authority to ask that question, nor to require an answer thereto, I decline to answer that question.

"Q. In your written testimony, read to the committee at the beginning of your examination, you state the following: 'In conducting the campaign, neither I nor anyone acting under my direction or with my knowledge, violated any laws, statutory or moral, and did only those things which are perfectly legitimate in accordance with law and good morals. Every dollar contributed and collected was spent lawfully. No voter or official was corrupted or sought to be corrupted.' That statement made by you would come within the rule, as I understand it, sometimes invoked in the courts and called a short rendition of facts, and if I understand the laws of evidence correctly, that character of evidence is admissible in a legal trial only when some cause beyond the ability of the witness to avoid he can not give the facts in greater detail, or which is not susceptible of a more detailed statement. It would appear that in your instance the details of this fact which you have thus rendered in a short way can be given, and I will, therefore, ask you to state how you spent the money contributed and collected by you in this campaign? A. I decline to answer that question for the reasons heretofore given.

"Q. I will ask you, Mr. Wolters, to give the committee the names of all persons, firms or corporations which you paid any money to during the campaign, and to state for what service or material you

made such payment? A. For the reasons heretofore given, I decline to answer that question.

"Q. Please state the amount you paid out for office help at your Houston office? A. For the reasons heretofore given, I decline to answer that question.

"Q. Please state the amount you paid out for office help at your Dallas office? A. For the same reasons I decline to answer that question.

"Q. Please state the amount you paid out for advertising in the newspapers, and the names and amount of the papers to whom such money was paid for advertising? A. For the same reasons heretofore given, I decline to answer that question.

"Q. Please state the amount of money you paid out in this campaign as expense money to speakers who were speaking for you or under your direction in the recent campaign? A. For the same reasons heretofore given, I decline to answer that question.

"Q. Please state the amount of money you paid out to speakers who were speaking for you or under your direction during the recent campaign, which was paid to them as compensation, or paid to them for other purposes than expenses? A. For the same reasons I decline to answer that question.

"Q. Please state the amount you paid out for publishing and distributing literature or campaign documents during the recent campaign and to whom you paid such funds? A. For the same reasons, I decline to answer that question.

"Q. I will separate the question. I probably should have asked it in two to begin with. Please state the amount of money you paid out for publishing and distributing campaign literature or documents during the campaign just closed? A. I decline to answer that question for the same reasons heretofore stated.

"Q. Please state the amount of money paid out by you in payment of the expenses of organizers who assisted you in the organization of the State at any time during the recent campaign? A. For the same reasons heretofore given, I decline to answer that question.

"Q. Please state the amount of money you paid out as expense money for such organizers during the recent campaign? A. I decline to answer that question for the same reasons heretofore given.

"Q. Please state the amount of money paid out by you in any manner than I have heretofore named as expenses in the recent campaign just closed? A. For the reasons heretofore given, I decline to answer that question.

"Q. I will ask, Mr. Wolters, if you kept, caused to be kept, or if anyone kept for you or under your direction, an account of the receipts in the way of campaign contributions? A. I decline to answer that question for the same reasons heretofore given.

"Q. Please state if you kept, cause to be kept, or anyone kept for

you, or under your direction, an account or books of the expenditures made and incurred and paid by you in behalf of you or your committee during the recent campaign? A. For the same reasons heretofore given, I decline to answer that question.

"Q. It has been stated about the Capitol here, from what source I do not know, and have no information, but I have heard that the books containing the account of your recent campaign have, since the campaign, been burned or destroyed. Please state whether or not this rumor is a true one or a correct one? A. For the reasons heretofore given, I decline to answer that question.

"Q. On behalf of the committee, I will request you, Mr. Wolters, to submit to the committee an itemized statement of your receipts and disbursements during the last campaign. I refer, of course, to the campaign receipts and campaign disbursements. A. With all due respect to the commitee, I will decline to undertake to do so.

"Q. I will ask you if you have, either here or at your office, or at any other place, books, vouchers, checks, drafts, receipts, records, memorandums, or other evidence of receipts and disbursements, from which could be compiled a record of your receipts and disbursements, or a record of either? A. I decline to answer that question for the same reason heretofore given.

"Q. If you have the documents, books, papers, records, checks, drafts, vouchers, memorandums and such instruments as I have heretofore named, in your possession, or within your charge, or subject to your possession, will you place those documents before this committee, or a sub-committee appointed by it, for inspection and examination, in order that this committee may compile therefrom a record of your receipts and disbursements during the recent campaign? A. I shall decline to answer that question for the same reasons heretofore given.

"That each and all of the foregoing questions were pertinent and material to the inquiry before the committee, but the said witness, J. F. Wolters, knowingly and wilfully refused to answer the same.

"That afterwards, while the said witness was being examined by Hon. W. T. Bagby, a member of this committee, and who had heretofore been appointed to assist in the conduct of the examination of witnesses, the said witness was asked the following questions, after he had testified that contributions were made to his campaign fund by bankers in the State:

"Q. Would you decline to give his name? A. I would.

"Q. Do you decline to inform this committee the names of those bankers? A. I do.

"Q. I want to know if any preachers made any contribution to your campaign fund within your knowledge? A. Not that I know of in the way of funds. Some preachers assisted us by writing articles that were used.

"Q. I want to know if any farmers in Texas contributed to the anti-prohibition campaign fund? A. Yes, sir.

"Q. Do you decline for the reasons heretofore stated to give the names of those farmers? A. I do.

"Q. Merchants or anybody else, as I understand your answer to mean? A. I decline to give the name of any person who contributed to this campaign fund, because I do not think it is pertinent or material to the inquiry that the committee is conducting, and that it has not got the authority under the Constitution to inquire into that and require me to answer.

"That the said foregoing questions were pertinent and material to the question of the inquiry before the committee, but the said witness, Wolters, knowingly and wilfully refused to answer the same or any of them.

"That said questions were all asked the said witness while the House Investigating Committee was in session, and while the witness was legally before it and duly sworn to testify as a witness, and that the said witness knowingly and wilfully declined and refused to answer the said questions; that the questions were all pertinent and relevant to the matters under investigation by this committee.

"That afterwards, on the 22d day of August, A. D. 1911, your committee, by resolution, a certified copy of which is herewith attached and marked 'Exhibit A' resolved that such failure and refusal of the witness to answer said questions was in contempt of this committee, and that the same was and is an obstruction of the lawful proceedings of the House of Representatives of the Thirty-Second Legislature, and of the lawful proceedings of this committee, and was and is in contempt of the House of Representatives of the Thirty-Second Legislature. And also resolved that these facts, together with the questions asked the said witness and which he declined to answer, be certified by this committee, through its chairman and secretary, to the House of Representatives of the Thirty-Second Legislature for such action and punishment as the House of Representatives may decree.

"Therefore, in accordance with the resolution adopted by this committee, the facts relative to said witness are herewith reported to the House of Representatives with the recommendation that the said witness, J. F. Wolters, be adjudged to be in contempt of the House of Representatives of the Thirty-Second Legislature, and of the lawful proceedings of a lawful committee of the House of Representatives of the Thirty-Second Legislature, and that his conduct in the premises was and is in contempt of this committee and in contempt of the House of Representatives; and we recommend that such witness be required to purge himself of such contempt by appearing before this committee and answering each and all of such questions so lawfully propounded to him, and that he be punished in such manner and to such extent as the house of Representatives may adjudge and

be within the lawful power and authority of the House of Representatives.

Luther Nickels,
Chairman of the House Investigating Committee.
H. B. Savage,
Secretary of the House Investigating Committee.

"Whereas, on the 17th day of August, A. D. 1911, J. F. Wolters, of Harris County, Texas, in obedience to a subpoena duly and legally issued by this committee, appeared as a witness before the House Investigating Committee, and during his examination by the members of said committee, declined and refused to answer certain lawful and proper questions propounded to him by the members of such committee; therefore be it

"Resolved by the House Investigating Committee, that such disobedience is in contempt of this committee, and that the same is an obstruction of the lawful proceedings of the House of Representatives of the Thirty-Second Legislature and of the lawful proceedings of this committee, and is in contempt of the House of Representatives of the Thirty-Second Legislature, and that these facts, together with the questions asked the said witness and which he declined to answer shall be certified by this committee through its chairman and secretary to the House of Representatives of the Thirty-Second Legislature for such action and punishment as the House of Representatives may decree.

"I hereby certify the above and foregoing is a true and correct copy of the resolution passed by the House Investigating Committee at its session held on the 22d day of August, 1911, as the same appears of record upon the minutes of said committee.

H. B. Savage,
Secretary of the House Investigating Committee."
(Journal 378-381.)

Thereupon on said date members of the House offered this resolution in the House: After reciting that said investigating committee had made to the House the above report, copying it in full again as just above:

"And whereas, It appears from said report that one J. F. Wolters, of Harris County, Texas, was lawfully and legally summoned to appear as a witness before the House Investigating Committee, and in compliance with said subpoena did so appear, and after being sworn and while testifying, said witness did wilfully decline and refuse to answer certain questions propounded to him by said committee and under its direction, all of which said questions are shown heretofore in this resolution, in the report of said House Investigating Committee to the House of Representatives, and

"Whereas, It appears to the House of Representatives that each and

all of said questions were pertinent and material to the question of inquiry before the House Investigating Committee, and

"Whereas, it appears to the House of Representatives that such failure and refusal on the part of said J. F. Wolters to answer each and all of said questions was and is an obstruction of the lawful proceedings of the House of Representatives and of the lawful proceedings of a lawful committee of the House of Representatives, therefore, be it

"Resolved by the House of Representatives of the Thirty-Second Legislature of the State of Texas, in session at the First Called Session thereof, in the city of Austin, Texas:

"First, that the said J. F. Wolters, the witness aforesaid, be and he is hereby held and adjudged to be guilty of contempt of the House of Representatives, and of obstructing the lawful proceedings of a lawful committee of the House of Representatives.

"Second, that the said J. F. Wolters be cited to appear at the bar of the House of Representatives at 2 o'clock p. m. on the 24th day of August, A. D. 1911, then and there to show cause, if any he has, why the aforesaid adjudication of contempt against him should not be made final, and why he should not be held and adjudged in contempt of the House of Representatives and punished therefor as required and permitted by law.

"Third, that the chief clerk of the House of Representatives and the Speaker thereof, be, and they are hereby ordered and directed to issue citation and notice to the said J. F. Wolters, whose place of residence is in Harris County, Texas, but who may be found in Travis County, Texas, to appear at the time and place and for the purpose aforesaid.

"Fourth, that said citation and notice aforesaid shall contain a copy of this resolution.

"Fifth, that the service of said citation and notice may be made by the sergeant-at-arms or any assistant sergeant-at-arms of the House of Representatives, or any officer authorized by law to serve notices and citations of this character, by delivering to said J. F. Wolters, in person, a true copy thereof. Nickels of Hill, Brown, Hunt, Nichols of Hunt, Savage, Rowell, Cureton, Williams of McLennan, Bagby."

The journal of the House of August 24 then shows that the Speaker announced and the House took up and considered this matter, again copying the report of said committee, and the action of the House thereon above shown in full again. That the Hon. said Mr. Wolters appeared before the bar of the House in open session, and being called upon to show cause why he should not be adjudged in contempt and punished therefor, in wilfully failing and refusing to answer said questions to him, then presented and read this his answer:

"To the Honorable, The House of Representatives of the Thirty-
Second Legislature of the State of Texas, now in Special Session,
and to the Honorable Sam Rayburn, Speaker of said House of
Representatives:

"Comes now the respondent, J. F. Wolters, in obedience to the
citation served upon him on this the 23d day of August, A. D. 1911,
commanding him, among other things, to appear and show cause why
he should not be held in contempt of this House and of your special
investigating committee, for declining to answer questions submitted
to him and interrogatories propounded to him by your committee, as
set forth in its report to this House, filed on the 22d day of August,
1911, a copy of which so served upon him is hereto attached and
marked Exhibit 'A' and made a part hereof. Your respondent says:

"1. That at the time when he learned of the fact of the appoint-
ment of your committee under the resolution by virtue of which they
are acting he was in the State of New York, United States of America;
that for many weeks prior to the day of the recent prohibition elec-
tion, which took place on the 22d day of July, 1911, he had engaged
passage on the steamer 'Antilles' for himself and wife to go from the
city of New Orleans by water to the city of New York; that before
this special session of the Legislature convened, and therefore before
the resolution under which said committee is acting, and before said
committee was appointed, he had left the State of Texas in the man-
ner above indicated in company with his wife for the purpose of
spending forty or sixty days in the North; that he left this State on
the 28th of July, 1911; that after the resolution aforesaid had been
passed by this Honorable House, and after the committee aforesaid
had been raised, your respondent was advised of these facts, and that
his testimony was desired before said committee, and although he
was beyond the reach of process of said committee, and beyond the
reach of process of this House, and no process had been or could have
been served upon him, compelling him to return to this city and
State to testify before said committee, he voluntarily returned to the
State, coming directly from New York to Austin in order to appear
before said committee and to answer any legal, constitutional and
proper question or any question which said committee might propound
about anything which he had any doubt of its right to inquire about;
that soon after his arrival in the city of Austin, on the 17th day of
August, 1911, an ordinary subpoena was served upon him, issued by
the chairman of your said committee, commanding his presence before
it to testify; that he immediately, and within a few hours after reach-
ing this city, responded to said subpoena and reported to the secre-
tary of said committee his appearance and his readiness to testify
upon proper and legal questions; that he did appear when desired
by said committee and submitted to being sworn as a witness to
testify before it. That he submitted to said committee a written
statement prepared by him which set forth, as he believes, all perti-

nent facts within his knowledge concerning all matters which said resolutions authorized said committee to investigate, which they have the right to investigate and to propound questions upon, under the Constitution of the State of Texas; that he, therefore, has shown by his conduct and acts and now declares the fact to be that he was not in contempt either of said committee or of this House and had no purpose to be in contempt or to show contempt for either of them.

"2. Your respondent further says that it is a fact so far as he remembers that he declined to answer each and every one of the questions propounded to him by said committee as set forth in a copy of the report of said committee, made to this House and served upon him which is attached hereto and called Exhibit 'A'; that he refused to do so because he believed and still believes this Honorable House had not the authority or the power under the Constitution to appoint a committee and invest it with authority to make such inquiries and demand answers hereto of any citizen of the State of Texas or of your respondent; he believes and charges the fact to be that such inquiries were not made and are not being insisted upon for any legitimate and lawful purpose; that the information attempted to be secured by each and all of said interrogatories was not intended and is not intended to assist the Legislature or the House of Representatives thereof in gaining any information for the purpose of assisting in legislation or for the purpose of carrying out and putting in force any authority or power vested in, or duties imposed upon the Legislature of Texas, but on the contrary believes that said inquiries were made and said information desired solely and only for political purposes and intended to be used in behalf of one side of a political division of the people of Texas upon a question of adopting or not adopting a constitutional amendment prohibiting the manufacture and sale of intoxicating liquors in this State, and that said inquiries were made about and concerning subjects which are private in their nature which can serve no public purpose within the power of this Legislature to correct and are without and beyond the jurisdiction of this House to inquire about, investigate or act upon; that to have answered the questions propounded would have forced this respondent to have violated his duties and obligations to many people who contributed to the campaign fund accumulated to be used legitimately, in an effort to defeat the adoption of a prohibition amendment, voted upon on the 22d day of July last, which he and those associated with him believed if adopted would be most seriously injurious to the people of Texas, and would have caused said contributors, who contributed in a lawful way as testified to by him, inconvenience, vexation and loss of business, to unreasonable partisans located in their respective places of residence and with whom and for whom they respectively transacted business and would have violated the confidence which was reposed in him by many persons who contributed by their efforts and influence in assisting him in a lawful way in

his committee opposing said amendment to defeat the adoption of same, and he respectfully declined to answer said interrogatories and now stands upon his constitutional right and his individual obligation not to answer said impertinent, unlawful and unconstitutional demands.

"3. Your respondent further says that it is his belief, and he so charges, that the resolution under which your said committee is acting was adopted and is attempted to be enforced in violation of the Constitution of the State of Texas, and that this honorable body has no authority under the Constitution to pass said resolution embodying the provisions thereof, and no authority under the Constitution to empower the committee as has been attempted to be done, to make the investigation therein ordered, or to make the inquiries and elicit the testimony thereunder sought to be elicited from your respondent or anyone else.

"4. Your respondent shows to this honorable body that if the resolution is held to be constitutional, and that the same has been lawfully passed, and that the committee thereunder has lawful authority to do as therein commanded, then by simple resolution as therein provided, said committee is invested with the following powers and authorities:

"'(a) All of the power necessary to carry out the full and complete terms of said resolution.' You will see by said expression of said resolution that no limit is placed upon the power of said committee and that the human mind can not conceive under its provisions of any class or character of coercion or force which might be used by said committee and its subordinates (selected by itself) which could not be exercised over citizens of this State and their property uncontrolled by anything except the will and discretion of the members of said committee.

"(b) 'All of the authority conferred by law under chapter 7 of the Acts of the Thirtieth Legislature.' Under the authority of said Act this committee is given the power to issue process of its own creation, power to legislate and make process of its own type and character, to determine how it shall be executed and by whom it shall be executed, to compel the attendance of witnesses and the production of papers, and property of citizens, including, of course, the right of search and seizure of the persons and property of the citizens of this State, and with express power to condemn any citizen who disobeys any of its orders, or evades its process, of being guilty of contempt of said committee, and to impose upon any such citizen a pecuniary fine of $100 and imprisonment for any length of time, limited by the duration of the then session of the Legislature, and many other powers in violation of the Constitution of the State of Texas.

"(c) In addition to the powers set forth in paragraphs (a) and (b), said resolution confers upon said committee, for disobedience of its demands the power to adjudge such citizen guilty of contempt, and

to bring him before the bar of this House for such contempt, there to be dealt with as the members of this House may deem necessary, without limitation or restriction.

"5.   Your respondent further says that your said committee by and under the direction of said resolution have undertaken and are undertaking to carry out and execute such unlawful authority, undertaken to be conferred by this House, upon your respondent and upon many other citizens of the State of Texas, in violation of the Constitution of this State.

"6.   It will be observed that if the powers sought to be conferred by the resolution have been conferred that said committee has greater power than any District Court or other court has conferred upon it by the Constitution of this State.   It will be observed that the resolution provides that all necessary expenses incurred by the members of the committee, including the necessary traveling expenses by the members of the committee or incurred under its direction, in pursuance of said investigation, shall be paid out of the contingent expense fund of the House; that such committee shall elect its own chairman and such other officers as it may desire and establish, and make such rules for governing its own procedure and form of process as may be permitted by law, thus giving it legislative power both to appropriate money and to create forms of process and methods of executing same; that it has legislative power to appropriate money without limit, and controlled only by its desire; that under it, if lawful, said committee can appoint one officer or a thousand, and summon one witness or a hundred thousand, and if said authority is lawful could bankrupt the State of Texas.

"7.   Your respondent insists that said resolution is violative of the following provisions of the Constitution of the State of Texas, whose creature this Legislature is, namely:

"(a)   Article 1, section 2, of the Constitution, provides 'that all political power is inherent in the people, and all free governments are founded on their authority and instituted for their benefit.'   This provision is cited for the purpose of showing the inaccuracy of the oft repeated statement that the Legislature has any inherent power.   I contend that the Legislature and this House has no inherent power, that it must look to the Constitution of this State for all power by it possessed, and that the Constitution has conferred upon it by a section hereinafter quoted only legislative power and under proper constitutional restrictions, and therefore for this House to undertake to exercise inherent power or to confer such power upon its committee is in violation of the express terms of the Constitution.

"(b)   Article 1, section 9, of the Constitution, provides 'that the people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures or searches, and no warrant to search any place or to seize any person or thing shall be used without describing them as near as may be, and only with probable cause sup-

ported by oath or affirmation.' Your respondent shows to you that if the authority attempted to be conveyed by your resolution has been conferred, you have given to said committee without limitation all powers which it thinks necessary to carry out the provisions thereof, and the power to prescribe, manufacture, make, create and cause to be executed, any kind of process which it deems necessary and advisable, to enforce such power as it deems necessary or desirable. That such power might include, and in fact it is undertaking to enforce, the power of seizing the property, books and papers and persons of individuals citizens without any specific allegation of wrongdoing on their part and without any oath or affirmation that any wrong has been done or attempted by them or any of them, and that such resolution on that account is in violation of the Constitution and void.

"(c) Article 2, section 1, of the Constitution provides 'the powers of the government of the State of Texas shall be divided into three distinct departments, each of which shall be confined to a separate body of magistracy, to wit, those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person or collection of persons being of one of these departments shall exercise any power properly attached to either of the others except in the instances herein expressly permitted.'

"Your respondent contends that the above is a clear declaration of our Constitution separating these three great governmental functions and declaring in so many words and so plain that they can not be misunderstood, 'that neither department shall exercise any of the powers of any other department, except in the instances therein expressly permitted,' and your respondent asserts that said resolution undertakes to confer upon your committee legislative power, judicial power and executive power, and is therefore in violation of said provision of said Constitution and is void.

"(d) Article 3, section 1, of the Constitution, provides: 'The legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled the Legislature of the State of Texas.' By this provision your respondent contends that the Constitution confers upon the Legislature so composed all legislative power and none other except such other power as is expressly conferred by the Constitution itself, and that this power conferred upon the Legislature as a whole, consisting of the Senate and House of Representatives, can not by the entire body be delegated to either branch thereof, nor can the entire body or either branch thereof, delegate legislative power to a committee of either branch or to a joint committee of both branches, as has been attempted to be done under the provisions of said resolution, i. e., the power to create process of its own liking, the power to execute the same in its own way, the power to adjudge people guilty of criminal conduct, the power to convict them, the power to enter judgments of conviction, and the power to execute the sentence of such judgment, and the

power to appropriate and expend the money of the people in unlimited quantities.

"Your respondent shows to this honorable body that article 3 of said Constitution, by its various subsequent sections, sets out clearly and explicitly how and in what manner the Legislature is to exercise its legislative power, and that it can not do so in any other manner must be apparent.

"(e) The Constitution, article 3, section 5, provides: 'The Legislature shall meet every two years at such times as may be provided by law and at other times when convened by the Governor.' Your respondent calls attention to the fact that the Legislature can not meet for general legislative purposes except in regular sessions biennially at such times as is provided by law, and that at such regular terms only can it engage in general legislation.

"That under section 40 of said article No. 3, the Constitution provides: 'When the Legislature shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling said special session or presented to them by the Governor.'

"Your respondent calls attention to the fact that the present special session of this Honorable House is a called session, made by the Governor, and is, therefore, controlled by said section 40 of the Constitution, and can not legislate upon any subject except such as has been submitted to it by the Governor and that the subject or subjects of amending or changing the present election laws or of enacting new laws governing elections, has not been submitted, nor has the Governor submitted to this Legislature the subject of passing upon and creating laws to prevent the contributions of funds by individuals, associations or corporations for campaign purposes nor for the purpose of legislating to prevent conspiracies, to corrupt the ballot box or influence elections, nor any other subject upon which the testimony sought to be elicited would give any light or information; that it is clear that there can be but two classes or kinds of sessions of the Legislature, one a regular session and the other a called session, as set forth in the two provisions of the Constitution just quoted.

"Your respondent further desires to call your attention to the fact that if the resolution under which your committee is acting is contended to be legislation, then the Legislature has not passed it in accordance with the provisions of the Constitution, and if it is not legislation, then it is an effort to do something and to exercise power, which by the terms of the Constitution neither this House or both Houses combined has the power to do.

"(f) Section 11 of article 3 of the Constitution provides: 'That each House may determine the rules of its own proceedings, may punish members for disorderly conduct and with the consent of two-thirds, expel a member, but not a second time for the same offense,' and section 15 of article 3 provides: 'That each House may punish

by imprisonment during its session any person not a member for disrespectful or disorderly conduct in its presence or for obstructing any of its proceedings, provided such imprisonment shall not at any one time exceed forty-eight hours.'

"Your respondent respectfully shows to this honorable body that the last two quoted sections of said Constitution contain all of the power embraced in this Constitution by and under which this House may punish any person whomsoever except in the case of impeachments of officials, and your respondent calls attention to the fact that he is not a member of the Legislature and therefore not subject to the provisions of said section 11. That he has not been disrespectful or been guilty of disorderly conduct in the presence of this House, nor has he in any manner obstructed any of its proceedings and therefore he has not committeed any act which by the terms of said Constitution empowers this House to try or condemn him, and he avers that the effort to do so is unconstitutional and void.

"(g) Article 3, section 44, of the Constitution provides: 'The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors not provided for in this Constitution, but shall not employ anyone in the name of the State unless authorized by preexisting law.'

"Your respondent respectfully calls your attention to this provision of the Constitution and to the provision of your resolution which undertakes to permit your committee to create officers, select officers, fix their salaries and expend the public moneys of this State in the payment of said salaries and the payment of the expenses of your committee in unlimited quantities in violation of said Constitution, and therefore your said resolution is unconstitutional and void.

"(h) Article 5, section 1, of the Constitution, as amended in 1891, provides: 'The judicial powers of this State shall be vested in one Supreme Court, in Courts of Civil Appeals, in a Court of Criminal Appeals, in District Courts, in County Courts, Commissioners Courts, in courts of justices of the peace and in such other courts as may be provided by law.'

"Your respondent respectfully calls attention to the fact that your resolution undertakes to confer high judicial powers of the greatest magnitude upon your committee over the persons and property of citizens of Texas, in violation of that provision of the Constitution. That this Legislature has no authority under the Constitution (but such authority is prohibited) to confer judicial powers upon committees of your House or upon persons who are not judges of courts or upon any executive officer, and of which resolution seeks to do, and in addition your resolution undertakes to confer legislative power upon your committee which under the Constitution can not be done, and for these reasons as well as the others, said resolution is unconstitutional and void.

"(1) Your respondent calls your attention to the fact that by this resolution you have undertaken to confer upon a committee of your own selection of your own members, powers which the Legislature as a whole has not and which neither branch thereof possesses under the Constitution, and that this can not be done. If it be conceded that both Houses acting concurrently or either branch of the Legislature can confer powers upon itself not granted by the Constitution, then there is no limit to the power which the Legislature may confer upon itself and thus enable it to usurp all the powers of the government.

"(8) This respondent further shows to this Honorable House that in declining to answer the several questions referred to in its said resolution, and in each and all of his acts in the premises, he has acted under the advice of counsel learned in the law, that he has not obstructed nor intended to obstruct the proceedings of this House or its said committee, or in any manner whatsoever intended to be in contempt thereof; that in what he has done he had only asserted his right as a citizen under the Constitution and resisted what he conceived to be unwarranted and unconstitutional efforts to assert authority over him as a sovereign citizen by your committee, and he prays and requests that by resolution of this House he be exonerated and acquitted from any wrongdoing or intentional wrongdoing in any of the acts committed by him, and that he be declared not to be in contempt of this House.

J. F. Wolters,<br>Respondent."

(Journal 483-9.)

It is unnecessary to again copy "Exhibit A," referred to by Mr. Wolters, as it is the report of said committee including the questions to him, and the action of the House thereon exactly as above copied.

The journal of the House then fully shows that upon the invitation of the Speaker, Mr. Wolters then addressed the House. That his attorneys also in his behalf and defense addressed the House, and that Mr. Nickels, a member of the House, and Mr. W. D. Odell also addressed the House in support of said charges against Mr. Wolters. That the House while hearing these charges and the defense thereto adjourned and reconvened from time to time until on August 25th, when the House on motion of several members thereof, after again in a resolution reciting all of the proceedings of the House adopting said resolutions creating and approving said investigating committee in its action as aforesaid as to Mr. Wolters, and the proceedings of the House thereon shown above, adopted this motion:

"And whereas, It appears from said report that one J. F. Wolters, of Harris County, Texas, was lawfully and legally summoned to appear as a witness before the House Investigating Committee, and in compliance with said subpoena did so appear, and after being sworn and while testifying, said witness did wilfully decline and re-

fuse to answer certain · questions propounded to him by said committee and under its direction, all of which said questions are shown heretofore in this resolution, in the report of said House Investigating Committee to the House of Representatives, and

"Whereas, It appears to the House of Representatives that each and all of said questions were pertinent and material to the question of inquiry before the House Investigating Committee, and

"Whereas, It appears to the House of Representatives that such failure and refusal on the part of said J. F. Wolters to answer each and all of said questions was and is an obstruction of the lawful proceedings of the House of Representatives and of the lawful proceedings of a lawful committee of the House of Representatives; therefore be it

"Resolved by the House of Representatives of the Thirty-Second Legislature of the State of Texas, in session at the First Called Session thereof, in the city of Austin, Texas;

"First, that the said J. F. Wolters, the witness aforesaid, be, and he is hereby held and adjudged to be guilty of contempt of the House of Representatives, and of obstructing the lawful proceedings of the House of Representatives, and of obstructing the proceedings of a lawful committee of the House of Representatives.

"Second, that the said J. F. Wolters be cited to appear at the bar of the House of Representatives at 2 o'clock p. m., on the 24th day of August, A. D. 1911, then and there to show cause, if any he has, why the aforesaid adjudication of contempt against him should not be made final, and why he should not be held and adjudged in contempt of the House of Representatives and punished therefor as required and permitted by law.

"Third, that the chief clerk of the House of Representatives and the Speaker thereof be, and they are hereby ordered and directed to issue citation and notice to the said J. F. Wolters, whose place of residence is in Harris County, Texas, but who may be found in Travis County, Texas, to appear at the time and place and for the purpose aforesaid.

"Fourth, that the service of said citation and notice may be made by the sergeant-at-arms or any assistant sergeant-at-arms of the House of Representatives, or any officer authorized by law to serve notices and citations of this character, by delivering to said J. F. Wolters, in person, a true copy thereof.

"And whereas, In accordance with said resolution, citation and notice was so issued to the said J. F. Wolters, commanding him to appear at the bar of the House of Representatives at 2 o'clock p. m. on the 24th day of August, A. D. 1911, then and there to show cause why the former adjudication of contempt against him should not be made final; and why he should not be so held and adjudged in contempt of the House of Representatives and punished therefor;

"And whereas, On the 24th day of August, A. D. 1911, the said

J. F. Wolters, in obedience to said citation and notice aforesaid did appear at the bar of the House of Representatives, *and did then and there again wilfully fail, refuse and decline to answer the said questions so propounded to him by and under the direction of the House Investigating Committee and did wilfully fail and refuse to purge himself of the contempt of the House of Representatives heretofore adjudged against him; and it appearing to the House of Representatives that the failure and refusal on the part of the said J. F. Wolters as aforesaid to answer the said questions so propounded to him by the House Investigating Committee was wilful on the part of the said J. F. Wolters, and his failure and refusal to answer each and all of said interrogatories and questions jointly and severally was and is an obstruction of the proceedings of the House of Representatives of the Thirty-Second Legislature; and it further appearing that his failure to purge himself of contempt of the House of Representatives as aforesaid was wilful and contemptuous; therefore be it*

"Resolved by the House of Representatives of the State of Texas now in session at the First Called Session of the Thirty-Second Legislature in the city of Austin, Travis County, Texas, that said J. F. Wolters be and he is hereby adjudged to be guilty of obstructing the lawful proceedings of the House of Representatives and guilty of contempt of the House of Representatives aforesaid, and his punishment therefor is assessed at imprisonment in the county jail of Travis County for a period of twenty-four hours, unless the First Called Session of the Thirty-Second Legislature should adjourn sine die within a less period of time, in which event his punishment is assessed at imprisonment in the county jail of said county until the sine die adjournment of the Legislature, and no longer; and that the sergeant-at-arms of the House of Representatives or any assistant sergeant-at-arms of the House of Representatives is hereby ordered and directed to take the body of the said J. F. Wolters and commit it to the county jail of Travis County, Texas, for a period of twenty-four hours, or in the event the First Called Session of the Thirty-Second Legislature should adjourn sine die within a less period of time, then such officer shall commit the body of the said J. F. Wolters to the county jail of said Travis County, Texas, until such sine die adjournment, and no longer.

"Unless, however, the said J. F. Wolters shall purge himself of said contempt by appearing before the said House Investigating Committee, and then and there testify in answer to each and all of the questions herein set out and specified. And the sheriff of Travis County, Texas, is hereby ordered and directed to receive the body of the said J. F. Wolters into the jail of Travis County, Texas, for the purpose of said confinement; and a copy of this resolution certified to under the hand of the Speaker of the House of Representatives and the chief clerk of the House of Representatives shall have the force and effect of a writ of commitment hereunder, and shall be

sufficient authority for the imprisonment of said J. F. Wolters; said officers are also authorized to and shall issue a writ of commitment hereunder." (Journal 525.)

*In my judgment more complete and perfect proceedings could not have been made nor recorded in the journal of the House than was had and made in this whole matter.* The last proceedings of the House are fully and completely shown on pages 473 to 528 of the House Journal of August 24 and 25, 1911.

As stated above, just after the House had completed and closed its proceedings and judgment against Mr. Wolters, the Governor sent another message to the Legislature submitting four additional subjects of legislation. (Journal 528.) None of these, however, were subjects the Legislature had requested him to submit.

At once on August 25, after the House had adjudged Mr. Wolters guilty of contempt for obstructing its proceedings as above shown, the Speaker and chief clerk issued the proper commitment writ directed to the sergeant-at-arms, or any assistant, of the House, and to the sheriff or any constable of Travis County, Texas, as directed and commanded by the House, reciting the said proceedings, and judgment against Mr. Wolters and commanding said officials to take the body of Mr. Wolters, and deliver him to said sheriff, to be by him confined in the Travis County jail, as required by said judgment and order of the House. The said sergeant-at-arms on the same day, in obedience to said writ, took Mr. Wolters to have him imprisoned as ordered. Mr. Wolters at once sued out a writ of *habeas corpus* before Judge Harper, one of the judges of this court, who upon consultation with the other two judges and with their consent and concurrence, granted said writ, and, pending the hearing before this court, granted him bail, which he immediately gave, and he is now subject to the order of this court under said House proceedings and judgment.

The questions of the power of each House of the Legislature, one of the coordinate branches of this government, and the liberty of the citizen, being involved, is my only excuse for making the full and complete statement I have.

The briefs and argument thereon, as well as the oral arguments heard on the submission of this cause, by the eminent and able attorneys on both sides, show their exhaustive research, careful investigation and mature reflection and deliberation, and has been a material aid to me in reaching my conclusions.

I will now briefly discuss the questions in this case and give my conclusions thereon:

*First.* Did the House of Representatives have the right, power and authority at this special session and during its sitting to investigate the questions, or any of them, which it required to be investigated by its resolution above adopted on August 5, and by and through a com-

mittee composed of its members duly and properly authorized and required by it?

It is my opinion that it unquestionably had this right, power and authority on each and all of these grounds:

1st. Because it was a separate and independent branch of the Legislature, and by reason thereof it had not only all the power and authority expressly, or by necessary implication, conferred upon it by the people, the sovereign, by the Constitution, but also the inherent power and right, as such was not prohibited either by any express provision or necessary implication of either the Constitution of this State or of the United States.

2d. Because on August 5 the Governor by his special message and proclamation to the Legislature not only authorized, but urged the appropriation by the Legislature of "an extra appropriation for the purpose of investigating violations of the poll tax and election laws, and the enforcement of the same against offenders," wherein he further said: "It is alleged that irregularities and frauds were committed in the recent election on the proposed amendment to the State Constitution prohibiting the manufacture and sale of intoxicating liquors in Texas. It is also charged that in different counties and localities, individuals and county officials, violated the law regulating the payment of poll taxes." The very things the Legislature—and each House thereof—then properly and regularly determined and undertook to investigate *after this message of the Governor.* This unquestionably called for "legislation."

3d. Because the House "shall be the judge of the qualifications and election of its own members" (sec. 8, art. 3, Constitution), and "may determine the rules of its own proceedings, punish members for disorderly conduct, and with the consent of two-thirds expel a member. . . ." (Cont., sec. 11, art. 4.)

I fully concur in that part of Judge Harper's opinion in the Gray case on this point. It is needless for me to here repeat what he holds therein.

In Cushing's Law & Practice of Legislative Assemblies, in discussing the right of investigation in sec. 634, he says:

"It has always, at least practically, been considered to be the right of legislative assemblies, to call upon and examine all persons within their *jurisdiction,* as witnesses, in regard to *subjects,* in reference to which *they have power* to *act,* and into which they have already instituted, or are about to institute an investigation. Hence they are authorized to summon and compel the attendance of all persons, within the limits of their constituency, as witnesses, and to bring with them papers and records, in the same manner, as is practiced by courts of law. When an assembly proceeds by means of a committee, in the investigation of any subject, the committee may be, and usually is, authorized by the assembly to send for persons, papers and records."

Again, in discussing the jurisdiction of the Legislature, he says:

"A legislative assembly being authorized, in the exercise of its constitutional functions, both administrative and legislative, *to insti-*tute inquiries into all grievances of the citizen, which are remediable by legislative enactment, and into all · abuses of power by persons in office, with a view either to their removal by address, or to their punishment by impeachment, it has a power to investigate all such subjects, by the examination of witnesses, or otherwise, in the same manner, as is practiced by grand juries; and, as a consequence of this authority, the assembly itself, its officers and servants, and all persons connected with every such investigation, enjoy a perfect immunity for everything fairly said, done, or published, in the course of such inquiry.

"This jurisdiction, being conferred for the purpose of enabling a legislative assembly to discharge its peculiar functions, in a free, independent and intelligent manner, is in its very nature original, exclusive and final.

"It is original because, being conferred for the benefit of the assembly itself, and not for the advantage of any private individual, it arises only in reference to matters growing out of the proceedings, or connected with the official character of the members of the assembly.

"It is exclusive because, otherwise, the objects for which it is conferred, namely, the freedom and independence of the assembly, would fail of their attainment; inasmuch as a portion of the means, by which the assembly is enabled to perform these functions, would be restrained, by the concurrent or appellate jurisdiction of some other tribunal.

"But this jurisdiction is not exclusive in any other sense than this, that no other tribunal can control the action, set aside the judgments, or revise the proceedings, of the assembly. . . ." (Secs. 641, 645, 646, 647 and 648.)

Again, Mr. Cushing, in discussing the powers of the Legislature and the distribution of the functions of government into the three departments of legislative, executive and judicial, says: "In the exercise of their ordinary functions these three departments are entirely independent and free from the control each of the others; but from the nature of the functions attributed to each, the legislative, or law making must necessarily be the superior and sovereign power; for though it may not rightfully interfere with either of the others in the discharge of their respective duties, as a superior interferes in the proceedings and controls the acts of an inferior power, yet it may, in the exercise of its own appropriate functions, enlarge, restrain, alter or regulate, at its discretion, the powers and functions of the other departments." Section 704. Subject, of course, to constitutional limitations.

This court in Long v. State, 58 Texas Crim. Rep., 209, in passing upon section 40, article 3, of our Constitution, which is: "When the

Legislature shall be convened in a ·special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session, or presented to them by the Governor; and no such session shall be of longer duration than thirty days," and in discussing the constitutionality of an Act of the Legislature enacted at a special session, "changing, extending and re-arranging the terms of the Criminal District Court for Harris and Galveston Counties," wherein it was claimed that that subject of legislation had not been submitted to the Legislature by the Governor in the following language: "To enact adequate laws simplifying the procedure in both Civil and Criminal Courts of this State, and to enact laws amending and changing the existing laws governing court procedure as will reduce the present unusual and unnecessary expense of litigation and as will tend to the speedy administration of justice in civil and criminal cases," speaking through Judge Ramsey, among other things, said: "The Constitution does not require the proclamation of the Governor to define the character or scope of legislation which may be enacted at a special session, but only in a general way to present the *subjects* for legislation and thus confine the business to a particular field which may be covered in such way as the Legislature may determine. Baldwin v. State,· 21 Texas App., 591; Brown v. State, 32 Texas Crim. Rep., 119; Devereaux v. The City of Brownsville, 29 Fed., 742." And in further construing the said section 40, article 3, of the Constitution, further said: "We think these propositions laid down in the valuable brief filed in behalf of the State may be accepted as unquestionably sound:

"First: In the absence of a· constitutional provision limiting the . same, the jurisdiction of the Legislature when convened in special session is as broad as at a regular session, and that section 40 of article 3 of the Constitution constitutes an exception to the general rule, and is a limitation of the general power of the Legislature. And where such limitation is thus imposed upon the general power of the Legislature, it should be strictly construed, and should not be given effect as against such general power, unless the Act in question is clearly inhibited by such limitation. Baldwin v. State, 21 Texas Crim. App., 591; State v. Shores, 31 W. Va., 491, 13 Am. St. Rep., 875; (People v. Blanding, 63 Cal., 333); Cooley on Const. Lim., 204." His language therein to the effect "that the jurisdiction of the Legislature, when convened in special session, is as broad as at a regular session," is, in my opinion, specially applicable in this case. That was the unanimous opinion of this court at that time.

The Supreme Court of this State in Day Co. v. State, 68 Texas, 526, through that great judge, then Associate Justice, afterwards Chief Justice, Stayton, said: "The general rule is that the Legislature may exercise any power not denied to it by the Constitution of the State which is not delegated to the government of the United

States, or the exercise of which is not prohibited by the Federal Constitution."

Again, this court in Ex parte Mabry, 5 Texas Crim. App., 93, said: "The government of the United States is one of enumerated powers; the governments of the States are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look to the National Constitution to see if the grant of specified powers is broad enough to embrace it; but when a State law is attacked on the same ground, it is presumably valid in any case; and this presumption is a conclusive one unless, in the Constitution of the United States or of the State, we are able to discover that it is prohibited. We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the State to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the State was invested in its creation. Cooley's Const. Lim., 173."

This same doctrine is not only recognized, but expressly restated by the Supreme Court of the United States in the case of Kilbourn v. Thompson, 103 U. S., 168. To the same effect are the following cases: Holley v. State, 14 Texas Crim. App., 505; Ex parte Brown, 38 Texas Crim. Rep., 295; Rank v. Brown, 26 N. Y., 467; Re 34 St. R. R. Co., 102 N. Y., 343; People v. N. Y. Police Board, 107 N. Y., 235; (People v. Tompkins, 54 N. Y., 53). In fact, this doctrine in this country is elementary and no court of any standing has held otherwise.

In the case of Burnham v. Morrissey, 14 Gray (Mass.), 226, the Supreme Court of Massachusetts, through Chief Justice Shaw, said: "The House of Representatives has many duties to perform, which necessarily require it to receive evidence, and examine witnesses. *It is the grand inquest for the Commonwealth,* and as such has power to inquire into the official conduct of all officers of the Commonwealth, in order to impeachment. It may inquire into the doings of corporations, which are subject to the control of the Legislature, with a view to modify or repeal their charters. It is the judge of the election and qualification of its members. It has power to decide upon the expulsion of its members. It has often occasion to acquire a certain knowledge of facts, in order to the proper performance of legislative duties." This same doctrine is announced in many other cases by the Supreme Courts of various States. In my investigation I have been unable to find in any case, any well considered opinion where this doctrine is denied. In fact, I think it incontrovertible that either House of the Legislature of this State has the power and the authority to make any investigation which will aid it in the proper discharge of any of its legislative functions, strictly as such, as well as discharging whatever real or quasi-judicial power and authority it has, and for this purpose can compel witnesses to appear and answer all pertinent questions and to produce any and all

books, documents and papers which will aid it in ascertaining the facts in question. To my mind this is so clearly within the proper power, right and jurisdiction of either House of the Legislature of this State, at either a regular or special session thereof, that it is unnecessary to further discuss it, or cite additional authorities. Many of the authorities I cite on other propositions herein fully and completely sustain and support this doctrine.

Second: The next question is: Were the said questions, or any of them, which were asked Mr. Wolters, pertinent and material to the subjects of inquiry before the House by and through said committee? This question is included within the first question above discussed by me, and might appropriately have been discussed therein.

I again concur fully in what Judge Harper has said and decided in the Gray case on this question. Said investigating committee unanimously, deliberately and solemnly declared and decided that said questions "were pertinent and material," and so reported to the House, and the House in its deliberate and solemn proceedings declared and decided "that each and all of said questions were pertinent and material," to the questions under investigation by it.

To my mind, there can be no doubt that each and every one of these questions were pertinent and material, and if they had been answered, they might have established or disproved substantially if not fully at least some of the material facts sought to be developed.

That each and every one of the questions to Mr. Wolters, which he wilfully and deliberately refused to answer, pertaining to the question under investigation by the House, "affecting in any way the election or qualification of the members of the House of Representatives. . . .," or if as further stated in subdivision 8 of the resolution adopted by the House on August 5, "there exists in this State a conspiracy or formed purpose or design improperly to control, secure or effect in whole or part the election or qualification of the members of the House of Representatives," to my mind, were pertinent and material, there can be no doubt under sections 8 and 11, article 3, of our Constitution, hereinabove quoted.

Section 4, article 6, of our Constitution, not only as originally adopted, but readopted by the people on August 11, 1891, is: "Sec. 4. In all elections by the people, the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box. . . ." This constitutional provision means something. In fact, it means a very great deal. Before the resolution of the House ordering this investigation was adopted, as stated above, the Governor in a special message to them had told them: "It is alleged that irregularities and frauds were committed in the recent election in the proposed amendment to the State Constitution prohibiting the manufacture and sale of intoxicating liquors in Texas. It is also charged that in different counties

and localities individuals and county officials violated the law regulating the payment of poll taxes." And then urged the Legislature to legislate upon that subject to the extent of making an appropriation unusually large to be used by him for the purpose of himself investigating these questions. The House immediately thereupon adopted the resolution calling for an investigation by it, among other purposes, for the very purpose of determining for itself the truth of these charges, and then it could also decide whether or not it would make such an unusually large appropriation for the purposes specified by the Governor. Unquestionably thereunder it had the power and authority to investigate those questions for itself so that it could determine, before enacting the legislation called for by the Governor, whether or not it was necessary or proper to do so. That it desired such information also for the further purpose of then, or in the future, legislating or amending the laws on the subject of frauds and irregularities in elections, and the further regulation and payment of poll taxes, could make no difference. If the Governor wanted them to legislate on that subject for him, they could also investigate at least whether they needed legislation upon that subject for the people they represented as well, and whether they were authorized to amend the election laws and the laws regulating the payment of poll taxes so as to further "detect and punish fraud and preserve the purity of the ballot box" or not.

To my mind it was peculiarly and especially appropriate that at this special session of the Legislature the House should fully make this investigation. This Legislature at its regular session, which was concluded less than six months prior to this special session, had submitted the said constitutional amendment to the people for adoption or rejection, and in order that said election should in every way be free from fraud and that the sovereign voter of the State could cast his unpurchased vote and vote for or against its adoption without his vote otherwise being improperly influenced, had enacted special legislation thereon. That notwithstanding this the greatest frauds, and illegal voting and illegal issue and use of poll taxes, was charged openly and persistently by a large portion of the citizens of Texas. The election had just been held, less than two weeks before the Legislature convened. The witnesses were then living and easily accessible. It was not only appropriate, but even imperative, that such investigation should then be made so that the evidence could be had and preserved by the *"grand inquest for the State,"* the House and Senate of the Legislature.

By the purity of the ballot box used in our Constitution is meant—not that the box in which the ballots are placed shall be preserved pure—but that the vote of the voter himself shall be preserved pure, and shall not be tainted by the money power in the purchase thereof, nor of the liquor power in the corruption thereof, nor by any other power, but that that ballot of the voter himself shall thus be kept

pure and free. The very foundation of this government is based on the purity of the ballot itself. When that is corrupted by either the liquor interest or any other interest or the money power, then this government can not longer last. And it will no longer be "a free government founded on the authority of the people and instituted for their benefit." (Sec. 2, art. 1., Const.)

In my judgment, I again state, that there can be no doubt that each and every question that was asked Mr. Wolters which he wilfully declined to answer was both pertinent and material to the investigation that the House was then making with full power, authority and right to do so as deliberately determined by both the said committee and the House of Representatives.

It will be noted that Mr. Wolters did not claim that his answer to any of the questions would in any way incriminate him. His claim if so that the questions sought from him any of his private personal affairs, he was much mistaken. The election that had just been held and the question voted upon affected every man, woman and child of the four millions of people of the State of Texas. The election was necessarily a public one. Every person knew of it. The acts of Mr. Wolters and of those associated with him and those under his authority and direction, pertaining to the conduct of said election, and of the votes polled thereat, and the influences, whether of money or otherwise, employed therein to affect the voter, if there was any such, was of the most vital public importance to the government of the State of Texas and to every one of the citizens of the State. None of Mr. Wolter's individual personal private affairs were attempted to be gone into. It was only of his acts affecting the public in connection with the election just held.

The Supreme Court of the United States in Re Chapman case, 166 U. S., 669, in speaking of the questions asked the witness in that case, said, and so I say of the questions asked the witness in this case: "The questions were not intrusions into the affairs of the citizen; they did not seek to ascertain any facts as to the conduct, methods, extent or details," of his individual personal private affairs, but were of his acts and conduct pertaining to one of the most material questions dealt with by this State or any other. "We can not regard these questions as amounting to an unreasonable search into the private affairs of the witness simply because he may have been in some degree connected with the alleged transactions and as investigations of this court are within the power of either of the two Houses they can not be defeated on purely sentimental grounds. The questions were undoubtedly pertinent to the subject matter of the inquiry." All of the authorities lay down, and none dispute it, that where the tribunal making the investigation has the power and authority to do so and the questions are pertinent and material, no witness can refuse to answer, because of any confidential communication to him, nor of any private sentiment he may have, and he can

only refuse to answer when his answers will tend to incriminate him or they are confidential communications between attorney and client, or such like. Neither could he be the judge of whether the questions asked him were material and pertinent. The House and its committee had the right to decide that. Nor could he be immune from examination or cross-examination because he had read to the committee his conclusions as to any of the pertinent and material questions under investigation. The House and its committee undoubtedly had the right to examine him as a witness on each and all of these matters, in its own way, and probe the witness as to the *facts* from which he drew his conclusions.

Third. Another question is: When the Legislature, or either House thereof, acts within the scope of the authority vested in it, its motives for its acts can not be inquired into or questioned by any other tribunal.

I again fully concur in what Judge Harper says and holds on this question in the Gray case. On this question I will quote only briefly some of the authorities, and cite others. No court of high standing, nor reputable author, has ever held that the judgment of any tribunal which had final jurisdiction of the subject matter and of the person, and authority and jurisdiction to render the particular judgment, is subject to collateral attack, or that the motive of such tribunal can be inquired into by any other tribunal.

"The courts can not impute to the Legislature any other than public motives for their acts. People v. Draper, 15 N. Y., 532, 545, per Denio, Ch. J. 'We are not made judges of the motives of the Legislature, and the court will not usurp the inquisitorial office of inquiring into the bona fides of that body in discharging its duties.' Shankland, J., in the same case, p. 555. 'The powers of the three departments are not merely equal; they are exclusive in respect to the duties assigned to each. They are absolutely independent of each other. It is now proposed that one of the three powers shall institute an inquiry into the conduct of another department, and form an issue to try by what motives the Legislature were governed in the enactment of a law. If this may be done, we may also inquire by what motives the executive is induced to approve a bill or withhold his approval, and in case of withholding it corruptly, by our mandate compel its approval. To institute the proposed inquiry would be a direct attack upon the independence of the Legislature, and a usurpation of power subversive of the Constitution.' Wright v. Defrees, 8 Ind., 298, 302, per Gookins, J. 'We are not at liberty to inquire into the motives of the Legislature. We can only examine into its power under the Constitution.' Per Chase, Ch. J., in Ex parte McCardle, 7 Wall., 506, 514. The same doctrine is restated by Mr. Justice Hunt, in Doyle v. Continental Ins. Co., 94 U. S., 535."

Judge Cooley in his work on Constitutional Limitations, p. 258 (7th ed.), says: "And although it has sometimes been urged at the

bar that the courts ought to inquire into the motives of the Legislature where fraud and corruption were alleged, and annul their action if the allegation were established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon. The reasons are the same here as those which preclude an inquiry into the motives of the governor in the exercise of a discretion vested in him exclusively. He is responsible for his acts in such a case, not to the courts, but to the people." Amy v. Water Town, 130 U. S., 302; People v. Orange Co. Suprs., 17 N. Y., 235; Com. v. M'Williams, 11 Pa., 61; Sharpless v. Philadelphia, 21 Pa., 147; M. B. of Excise v. Barrie, 34 N. Y., 657; People v. Budd, 5 L. R. A., 559.

Fourth. The only other question necessary to discuss and decide is:

Has the House of Representatives of our Legislature the right, power and authority to punish by imprisonment for contempt one not a member, who obstructs its proceedings?

It is my opinion that the House, without a shadow of doubt, has this right, power and authority, on two grounds: 1st. Because the Constitution, in plain, clear and unequivocal language has expressly given it such right, power and authority. 2d. Because it has the inherent right and power of self-protection, and this is the only mode it can protect itself.

I believe these propositions are correct both on reason and authority. As shown above, of the three great departments—the Legislative, Executive, and Judicial—the powers of the government this State is divided into, "from the nature of the functions attributed to each, the legislative must necessarily be the superior and sovereign," or at least have functions covering a broader field than any of the others. It, of course, can not exercise any power properly belonging to either of the others, except where the Constitution expressly permits it (sec. 1, art. 2), yet it has clearly judicial powers in some instances, and also some executive, and all "legislative power of the State," which is "all which the people possessed" except where limited by the Constitution (Brown v. Galveston, 97 Texas, 8, 9 and 10), is expressly vested in the Legislature, and besides this it has expressly judicial functions. Neither of the others has any legislative powers. Is it possible that this great—possibly the greatest—department of the sovereign people has not the inherent power and authority to, itself, protect itself in the orderly discharge of its functions and in its regular proceedings? Is it under the necessity of calling upon one of the other departments for self-protection? I answer, when in session, unquestionably it, itself, has this inherent power, and it is not under the necessity of calling upon either of the other departments for self-protection, whether it is greater than the others or not.

In 36 Cyc., 851, this is laid down as the law: "The Legislature, or either branch thereof, has power to institute investigations or

inquiries in respect to matters properly coming before it, and in this connection may require witnesses to attend and testify before it or one of its committees, and it has power to punish for contempt witnesses summoned by it who refuse to appear, or to testify, or to produce documents which they have been lawfully required to produce."

Cushing's Law & Practice of Legislative Assemblies, in section 655, says:

"Like every other tribunal, a legislative assembly is authorized to punish persons, whether members or others, who are guilty of any contempt towards it, by disorderly or contumacious behavior in its presence, or by any wilful disobedience to its orders. It seems necessary to observe that the contempts punishable by a legislative assembly are not confined to proceedings in its judicial capacity, but may arise in the course of its legislative or other functions."

The Supreme Court of the United States in Anderson v. Dunn, 19 U. S. (6 Wheat.), 204, while recognizing and announcing the doctrine that Congress and each House thereof had only such powers as were expressly, or by necessary implication, delegated to them, yet expressly held that the House alone had the power and authority as a necessity for self-protection to punish for contempt. In my opinion the reasoning of the opinion in that case is very forcible and convincing. I know that in Kilbourn v. Thompson, 103 U. S., 168, the same court expressed some criticism of the extreme effect some of the grounds that decision might lead to by stating only, "that the tendency of modern decisions everywhere is to the doctrine that the *jurisdiction* of a court or other tribunal to render a judgment affecting individual rights, is always open to inquiry, *when the judgment is relied upon in any other proceeding.*" (Last italics mine.) But the Kilbourn case does not overrule the Anderson case. Neither does the Kilbourn case decide that the House of Representatives of Congress does not have the power to punish for contempt in the exercise of its legislative functions alone, for as to that doctrine the court expressly holds: "This latter proposition is one we do not propose to decide in the present case, because we are able to decide it (the case) without passing upon the existence or nonexistence of such a power in aid of the legislative functions." 103 U. S., 189.

The case of Anderson v. Dunn, supra, has never been overruled. What the court did hold in the case of Kilbourn v. Thompson, supra, is best expressed by the United States Supreme Court itself in the case of Re Chapman, 166 U. S., p. 668, as follows:

"In Kilbourn v. Thompson, 103 U. S., 168 (26:386), among other important rulings, it was held that there existed no general power in Congress or in either House, to make inquiry into the private affairs of a citizen; that neither House could, on the allegations that an insolvent debtor of the United States was interested in a private business partnership, investigate the affairs of that partnership, as

a mere matter of private concern; and that consequently there was no authority in either House to compel a witness to testify on the subject."

I concede that in the argument of the court in the Kilbourn case doctrines are announced at variance with the Anderson v. Dunn case, supra, but considered with what the court determined and what it said about the Anderson case it is not authority for a contrary doctrine. In my opinion the Kilbourn case is wholly unlike this, and is no pertinent authority in this case, in its last analysis.

In Re Chapman, supra, the Supreme Court of the United States expressly sustained the power of the United States Senate to punish a witness for contempt who refused to answer pertinent questions before its investigating committee which was acting under a resolution of the Senate alone in investigating "newspaper charges that members of the Senate were yielding to corrupt influences in the consideration of certain legislation." Among the important rulings of the Supreme Court of the United States in that case, are these:

"Under the Constitution the Senate of the United States has the power to try impeachments; to judge of the elections, returns, and qualifications of its own members; to determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member; *and it necessarily possesses the inherent power of self-protection.*" (Italics mine.) And again: "We grant that Congress could not divest itself, or either of its Houses, of the essential and inherent power to punish for contempt, in cases to which the power of either House properly extended."

That case is clear authority to the effect that each House of Congress "necessarily possesses the inherent power of self-protection," by punishing a contumacious witness with imprisonment for contempt, and that Congress itself "could not divest itself or either of its Houses of the essential and inherent power to punish for contempt in cases to which the power of either House extended."

It may be unnecessary to go to the extent of holding that the House had the inherent right, power and authority to punish for contempt one obstructing its proceedings. I willingly concede this for argument sake, for as I state above, the Constitution in plain, clear and unequivocal language has expressly given the House this power.

Section 15, article 3, is: "Each house may punish, by imprisonment, during its sessions any person not a member, for disrespectful or disorderly conduct in its presence, or for obstructing *any* of its proceedings; . . ."

Restated: "Each house may punish by imprisonment, during its sessions any person not a member . . . for obstructing *any* of its proceedings."

This provision seems never to have been passed upon by any of the courts in this State except in one case by our Supreme Court,

Canfield v. Gresham, 82 Texas, 10. In that case Canfield filed before a justice of the peace at Austin, Texas, a complaint, charging that the Speaker of the House, naming him, and another, an officer of the House, unlawfully and willfully assaulted him. Upon this complaint the justice issued a warrant for the arrest of these persons, which was executed by the constable, by arresting them and taking them before the justice. Canfield had nothing more to do with the matter, after filing the complaint and was not present when the arrests were made. Thereupon the House by resolution required Canfield to appear before the bar of the House to show cause why he should not be adjudged guilty of contempt of the House and imprisoned therefor. He was brought before the House and not purging himself of contempt, as the House thought, the House by resolution declared him "guilty of contempt of this House in obstructing its proceedings," and ordered him confined in the jail of Travis County for forty-eight hours, which was done. He afterwards sued all the members of the House who voted for this resolution and the officer of the House who executed the process for damages. The lower court after hearing the evidence peremptorily instructed a verdict against Canfield. He appealed. The validity of his said imprisonment, and the power and authority of the House to so adjudge, and imprison him, came directly before the Supreme Court which, after reciting the facts, and quoting said constitutional provision, section 15, article 3, and section 21, article 3, said: "The House had, unquestionably, the right to determine whether or not the acts of plaintiff (Canfield) were an obstruction to its proceedings, within the meaning of the Constitution, and having so determined, to cause him to be imprisoned as he was."

The House, in this case, as well as its committee, clearly and unequivocally, determined, decided and adjudged that Mr. Wolters was "guilty of obstructing the lawful proceedings of the House of Representatives" and directed his imprisonment for twenty-four hours.

That all this as shown by the journal of the House was its "proceedings," to my mind, is incontrovertible.

Let me briefly restate the salient facts. The House by a proper resolution determined to make the investigation, which it, without doubt, had the right and power to do. It appointed a committee of its own members and ordered it to do so. The committee, in obedience thereto, undertook to do so, and properly had Mr. Wolters come before it as a witness. When he was asked and required to answer "pertinent and material" questions, he wilfully refused. The committee reported all this in full to the House. The House determined the questions were pertinent and material, and that by his wilful refusal to answer he was "obstructing its proceedings" and entered judgment nisi against him for contempt and by proper resolution ordered him to appear before its bar, to show cause why such judgment nisi should not be made final, and gave him the opportunity

to answer the questions and to purge himself of contempt. He so appeared, and after full hearing not only failed to answer the questions and to purge himself of contempt, but still wilfully denied and defied the House and its power and authority in its proceedings of investigation, thereupon the House by full resolutions declared and determined that he was "guilty of obstructing its lawful proceedings," and ordered him punished for contempt by confinement for twenty-four hours. Each and all these proceedings are clearly and fully and completely shown in the journal of the House.

To my mind, it follows as a necessary consequence that this court is absolutely without right or power to prevent the judgment of the House from being enforced. To do so, it seems to me, would be usurping a power and authority prohibited by the Constitution. (Art. 2.)

To contend or claim that the action of the House was void and could not be enforced · because the journal of the House does not show that all this was a "proceeding of the House," it seems to me is without show of reason, and directly contrary to the very journal itself, and the clear determination of the House.

The "proceedings" of the House or Senate in each and every instance where a party was punished for contempt by either, and sustained by the courts in the cases cited by me herein, clearly show exactly the same course of dealing. In fact, I think it is the only proper way to have done and shown it by the Journal. It will not do for this court to decide that unless the House itself in open session conducts the examination of the witness and asks him all the questions, that its proceedings are void, for the House, and not this court, has the power and authority to determine its course of procedure. All the authorities so hold.

I believe that no well considered opinion by the court of any of the States can be found which hold that where either House of a Legislature has jurisdiction of the matter before it, that it has no power to punish for contempt anyone wilfully obstructing its proceedings, unless the Constitution of such State either expressly or by necessary implication forbids it such power.

The case of State v. Guilbert, 75 Ohio St., 1, holds that neither House has such power, but expressly states that the reason of that is the Constitution of that State "is explicit in excluding from the legislative department· the exercise of any power which is not delegated in the Constitution" (-page 44), and that no such power is delegated to either House thereof of the Legislature.

In addition to the authorities herein above cited I cite the following. Many of them not only discuss and decide this particular question, but also others I have already discussed and decided herein. 36 Cyc., 851, and cases cited in notes 27 and 28; (In re Chapman, 166 U. S., 671-2); People ex rel. McDonal, 99 N. Y., 481; State v. Matthews, 37 N. H., 450; Rapalpe on Contempt, sec. 2, p. 3; Cooley's

Const. Lim., 164 (7th ed., p. 193); Ex parte Parker, 74 S. C., 466; In re Falvey, 7 Wis., 630) Burnham v. Morrissey, 74 Am. Dec., 676 (Mass.); Anderson v. Dunn, 6 Wheaton, 204; People v. Sharp, 1 Am. St. Rep., 851; Ex parte Lawrence and Leavings, 116 Cal. 299; Ex parte McCarthy, 29 Cal., 395; Love v. Summers, 69 Mo. App., 637; In re Gunn, 50 Kan., 155.

In view of the conclusions I have reached, and announced herein, it is my opinion that the relator can not be discharged by this court, and that he should be remanded by this court to the custody of the sheriff of Travis County, to be by him imprisoned for twenty-four hours as adjudged and commanded by the House of Representatives of the Legislature of Texas, and I therefore dissent from the disposition made of this case by the court.

### ON REHEARING.

#### February 28, 1912.

DAVIDSON, Presiding Judge.—On a former day of this term applicant was released from custody for reasons stated in the original opinion. The State has filed a motion for rehearing, alleging various grounds why the original opinion discharging applicant was erroneous. Applicant files a replication or answer thereto and also moves to dismiss the motion for rehearing for want of authority in this court to entertain it, for the following reasons:

1. By all respectable authority, proceedings in habeas corpus to enlarge one unlawfully restrained of his liberty is considered as a criminal proceeding, and the action to be a criminal case. 2. Under the Constitution and laws of Texas the State has no right of appeal in criminal cases. 3. That the State of Texas in criminal cases has no right to ask for a new trial. 4. That the relator has already been discharged and found not guilty, and is no longer in custody, by order of the final judgment of this court discharging him, and that his bondsmen thereby have been discharged and no longer liable upon said bonds, and if this court were to grant the rehearing, it would be necessary to issue warrant of arrest and to enter a new decree commanding the arrest of applicant and imprisonment independent of the judgment of the House of Representatives.

This motion should be sustained upon all of the propositions asserted. There has been a great deal written by courts with reference to what it takes to constitute a civil and criminal contempt and drawing the distinction between the two. Whatever the nice line of distinction may be or how closely they have been drawn, there is absolutely no question of the fact or of the law of this case, that this is one of criminal contempt. There are no elements of the civil contempt connected with or growing out of it. The rule may be fairly stated from 7 vol. Am. & Eng. Ency. of Law, page 28: "Generally, it may be said that a criminal contempt embraces all acts committed

against the majesty of the law, and the primary purpose of their punishment is the vindication of public authority." Numerous instances are given and authorities cited to support this proposition; among others, Savin, Petitioner, 131 U. S., 267; Cuddy, Petitioner, 131 U. S., 280; In re Brule, 71 Fed. Rep., 943. It has been further held that proceedings in contempt are of two classes: First, those instituted solely for the purpose of vindicating the dignity of the court. These are criminal. Second, those instituted by private individuals for the purpose of investigating and enforcing their rights. These are civil. The authorities on this proposition are so numerous and so clear we deem it unnecessary to cite them. From any viewpoint of this case which can be taken, it is a criminal contempt, and, therefore, in a sense a criminal case. The statute expressly authorizes courts to punish by fine and imprisonment. The Constitution expressly authorizes jail imprisonment for contempt at hands of Legislature. All these matters are based on the proposition that they violate the dignity and majesty of the law and sovereign power of the State. It is not necessary to bring forward penal provisions of the Constitution in the Penal Code to constitute them criminal. That instrument is superior to the Penal Code. In the somewhat noted case of Gompers v. Bucks Stove and Range Company, 221 U. S. Rep., 417, 55 Law ed., p. 797, at p. 807, reviewing a great number of authorities, Mr. Justice Lamar, rendering the opinion of the court, said:

"If, then, as the Court of Appeals correctly held, the sentence was wholly punitive, it could have been properly imposed only in a proceeding instituted and tried as for criminal contempt. The question as to the character of such proceedings has generally been raised, in the Appellate Court, to determine whether the case could be reviewed by writ of error or on appeal. Bessette v. W. B. Conkey Co., 194 U. S., 324, 48 L. ed., 997, 24 Sup. Ct. Rep., 665. But it may involve much more than mere matters of practice. For, notwithstanding the many elements of similarity in procedure and in punishment, there are some differences between the two classes of proceedings which involve substantial rights and constitutional privileges. Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and can not be compelled to testify against himself. Boyd v. United States, 116 U. S., 616, 29 L. ed., 746, 6 Sup. Ct. Rep., 524; United States v. Jose, 63 Fed., 951; State v. Davis, 50 W. Va., 100, 40 S. E., 331, 14 Am. Crim. Rep., 282; King v. Ohio & M. R. Co., 7 Biss., 529, Fed. Cas. No. 7,800; Sabin v. Fogarty, 70 Fed., 482; Drakeford v. Adams, 98 Ga., 722, 25 S. E., 833.

"There is another important difference. Proceedings for civil contempt are between the original parties, and are instituted and tried as a part of the main cause. But, on the other hand, proceedings

at law for criminal contempt are between the public and the defendant, and are not a part of the original cause."

This is the latest expression of the Supreme Court of the United States that has been called to our attention with reference to what it takes to constitute a criminal contempt, and the necessary proceedings where the case is one of criminal and not civil contempt. See also as sustaining the Gompers case, supra, 92 U. S., 542 and 550.

To the same effect, so far as distinction between civil and criminal contempt is concerned, is the celebrated case of In re Debs, 158 U. S., 564. The Debs case was supposed to practically reach the limit so far as authority of the courts is concerned with reference to imposition of contempts for matters stated in that opinion. Whatever else may be said of the Debs case, it is clear that it drew a distinction between civil and criminal contempts, and that wherever it is in conflict with the latter opinion of the Supreme Court of the United States, it would be regarded as overruled. Whether there is a difference or not, I do not propose here to discuss, but all the authorities, so far as we are aware, maintain a distinction between civil and criminal contempts, and, that wherever the case is one of criminal contempt, it is treated as a criminal case or action. That is so under all the authorities in Texas, in the history of the Supreme Court and the Court of Criminal Appeals. Then the case will be treated as a criminal case and not civil.

It is settled by the Constitution and the statutes of Texas that in a criminal case the State can not move for a new trial. There is a statutory provision that a new trial can not be granted the State. Article 777, Code of Criminal Procedure, reads as follows: "In all cases of acquittal, the defendant shall be immediately discharged from all further liability upon the charge for which he has been tried, and judgment upon the verdict accordingly shall be at once rendered and entered." Article 836, Code of Criminal Procedure, thus provides: "A new trial can in no case be granted where the verdict or judgment has been rendered for the defendant." These articles are cited from the Revised Criminal Statutes as prepared by the codifiers and adopted by the last Legislature. The authorities in this State are rather numerous upon this question, a few of which will be cited: Perry v. State, 14 Texas Crim. App., 166; Robertson v. State, 14 Texas Crim. App., 211; Holt v. State, 20 Texas Crim. App., 271; Jeter v. State, 86 Texas, 555; Gay et al. v. State, 20 Texas, 504; Aber v. Warden, 49 Texas, 377; Cassaday v. State, 4 Texas Crim. App., 96; Ward v. State, 9 Texas Crim. App., 462. It will be noted that these cases are scire facias proceedings. Both this and the Supreme Court held that these were criminal cases in which the State would be relegated to the Constitution and laws with reference to motions for new trials and right of appeal. A criminal contempt is certainly as clearly a criminal case as is a sci fa on a forfeited

bond. It is not the purpose of this opinion to enter into a discussion of those matters. They have been so frequently decided that it is unnecessary to notice them further.

It is also thoroughly settled in this State that the State or the public, as contradistinguished from the citizenship, has no right of appeal in criminal cases. Article 5, section 26, of the Constitution, thus declares: "The State shall have no right of appeal in criminal cases." A criminal contempt is a criminal case as already distinguished, and, therefore, under no view of this question could the State have right of appeal. It will be noted that this is an original proceeding in this court and not an appeal. Had a trial court, either district or county, granted a writ of habeas corpus and discharged the applicant on the theory that he was not guilty of the contempt, the State would not have the right of appeal or the right to ask for a new trial. Had an appeal been prosecuted from a judgment discharging the applicant, under such circumstances, this court would promptly dismiss the appeal because of the provisions of the Constitution as set forth above, article 5, section 26. This court would also have held, if it decided the law correctly, that in the trial court the State would not have the legal right to ask for a new trial. In other words, being a criminal case, or a criminal action, the verdict of not guilty, whether at the hands of the court or the jury, discharged the prisoner absolutely and put the State beyond where it could ask for a new trial or take an appeal. As before stated, this is an original application before this court, and upon final disposition of the hearing of the case this court solemnly entered its decree discharging the prisoner from custody, thereby finding him not guilty of the contempt charged or sought to be enforced against him. Had this court in other character of original proceedings discharged the prisoner on the theory that he was not guilty of the matters charged against him, there would be no question of the soundness of the proposition that he should not be again arrested, and the State could not ask for a new trial. Under the authorities, this being a criminal case, the same rule will apply.

We might go further and cite the different sections of the Code of Criminal Procedure with reference to the matters of bail where parties are held under charges. In such cases where this court or the trial court has discharged under writ of habeas corpus, the State can not move for new trial, nor can the party be arrested again until after indictment is found. These, while somewhat analogous, are only cited to show that this principle is maintained throughout the criminal law and procedure so far as the right of the State is concerned to appeal or ask for a new trial. My brethren make of this case a civil suit tried before the House of Representatives, and this court on habeas corpus. This would be fatal to our jurisdiction. This court's jurisdiction is entirely of criminal matters and cases. Ex parte Reed, 34 Texas Crim. Rep., 9; Ex parte Berry, 34 Texas Crim. Rep., 36;

Legate v. Legate, 87 Texas, 248, 38 Texas Crim. Rep., 44, 40 Texas Crim. Rep., 84.

Being of the opinion that the law is clearly with the motion to dismiss the rehearing, it ought to be sustained, and the motion for rehearing or new trial dismissed. Inasmuch however as my brother Harper holds the court has authority to hear State's motion for rehearing, I agree with him fully that said motion for rehearing should be overruled.

.                                                            *Overruled.*

HARPER, JUDGE.—I do not agree with the opinion of Judge Davidson that the motion for rehearing should be dismissed, but think the motion to strike out the motion for rehearing should be overruled. For my views on this question see the case of Ex parte Gray this day decided. I am of the opinion, however, that the motion for rehearing should be overruled.

PRENDERGAST, JUDGE.—I fully concur in Judge Harper's opinion in the companion case of Ex parte Gray, this day decided on rehearing, to the effect that this habeas corpus proceeding is not a *criminal case,* and that this court can and should entertain the motion by the State herein for rehearing. The Constitution and statutes prohibiting a new trial to the State in a *criminal case,* are wholly inapplicable in my opinion.

I have again reviewed this case, and the Gray case, and my dissenting opinion in this, and the opinion of Judges Davidson and Harper on the original hearing, and I am confirmed in my opinion, that a rehearing should be granted and relator remanded to custody.